THOMAS C. STERLING
BLAIR STERLING JOHNSON
  MARTINEZ & LEON GUERRERO, P.C.
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Telephone: (671) 477-7857
Facsimile:  (671) 472-4290

THOMAS E. CLIFFORD
Attorney at Law
2nd Floor Alexander Building, San Jose
P.O. Box 506514
Saipan, MP  96950
Telephone: (670) 235-8846/7
Facsimile:  (670) 235-8848

*Attorneys for Defendant and Cross-Defendant
  Pro Marine Technology*

### IN THE DISTRICT COURT FOR THE
### THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| JOHN BRADY BARRINEAU, | ) | CIVIL ACTION NO. CV05-0028 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **AFFIDAVIT OF THOMAS C.** |
| | ) | **STERLING IN SUPPORT OF MOTION** |
| PRO MARINE TECHNOLOGY, | ) | **FOR APPROVAL OF GOOD FAITH** |
| CABRAS MARINE CORPORATION, | ) | **SETTLEMENT** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| AND RELATED CLAIMS. | ) | |
| _____ | ) | |

| | |
|---|---|
| GUAM, USA | ) |
| | ) ss: |
| CITY OF HAGÅTÑA | ) |

I, **THOMAS C. STERLING**, being first duly sworn, do state that:

1. I have personal knowledge of all matters set forth in this affidavit and if called to testify as to such matters I could and would competently do so.

2. Attached hereto as cumulative Exhibit "A" are true and correct copies of the relevant portions of Cabras Marine Corporation's First Set of Interrogatories to Pro Marine Technology and Pro Marine's responses thereto. As indicated by those responses, Pro Marine has admitted that the cause of the accident involved in this litigation was the conduct of an employee of Pro Marine in negligently turning off the air supply to Mr. Barrineau while he was involved in a dive. Pro Marine has never alleged that the accident was the fault of Cabras Marine. Cabras' sole involvement was the provision of a vessel to transport Pro Marine's crew and equipment to and from the project site.

3. None of the allegations in this action or discovery in this action has indicated the existence of any written contract between Cabras Marine and Pro Marine creating any express indemnity obligation. Moreover, none of the allegations in this litigation or discovery in this litigation has indicated any facts which would support a claim that Cabras Marine is vicariously liable for the

- 2 -

negligence of Pro Marine which caused the accident at issue herein.

4.    Attached hereto as Exhibit "B" is a true and correct copy of a Certificate of Insurance summarizing Pro Marine's coverage, including standard Worker's Compensation and Employer's Liability coverage, which was in effect at the time of the accident alleged in this litigation.  This policy provided policy limits of $100,000 under the Employer's Liability Coverage in connection with personal injury claims by employees and this was the only insurance coverage available to Pro Marine in connection with the Barrineau claims.  As indicated, Pro Marine had general liability coverage but that policy excluded coverage for injuries to employees such as Barrineau.

5.    Attached hereto as Exhibit "C" is a true and correct copy of a letter dated August 30, 2006 from Mr. Bruce Berline to me in which he offered to settle Mr. Barrineau's claims against Pro Marine and the Collards in consideration for a policy limits payment of $100,000.

6.    Attached hereto as Exhibit "D" is a true and correct copy of my letter of September 5, 2006 to Mr. Berline and Mr. William Fitzgerald in which I accepted, on

- 3 -

behalf of Pro Marine and the Collards, the $100,000 settlement offer.

7.    Attached hereto as Exhibit "E" is a true and correct copy of Takagi and Associates Inc.'s Check No. 23219 in the amount of $100,000 drawn payable to the William M. Fitzgerald Trust Account representing the settlement payment in connection with this matter.

8.    Attached hereto as Exhibit "F" is a true and correct copy of the Release executed by Mr. Barrineau in favor of Pro Marine, the Collards, and their insurance carrier in consideration for the $100,000 settlement payment referred to herein.

9.    Prior to the settlement, I retained the services of a psychiatrist licensed in Guam to review Mr. Barrineau's post accident psychiatric records for the purpose of advising me as to whether any psychiatric injury of significance had occurred as a result of the incident giving rise to this litigation.  My consultant advised me that it was his opinion that the initial diagnosis of Post-Traumatic Stress Disorder ("PTSD") was accurate although there was no medical evidence sufficient to establish dementia secondary to a lack of oxygen.  He advised that

- 4 -

the initial dementia diagnosis would have involved brain damage which would have been permanent and that the conditions which gave rise to this initial assessment had improved over time thereby negating any claim arising from alleged brain damage. My consultant also advised that the medical records indicated that Mr. Barrineau had a number of factors ongoing in his life at the time of this incident which likely contributed to his PTSD diagnosis although those conditions were completely unrelated to the diving accident.

10. Finally, I was advised that a report from Dr. Janet McCullough, attached hereto as Exhibit "G", which was produced by Barrineau during discovery, appeared to be an accurate assessment of Mr. Barrineau's condition and that that report, from a professional psychiatric standpoint, indicated substantial improvement which lead my consultant to conclude that Mr. Barrineau's condition was improving, that his PTSD symptoms had largely resolved, and that further improvement was expected. My consultant believed that Mr. Barrineau's ability to engage in boating activities clearly indicated that the dive accident related

- 5 -

1   PTSD was much improved since, if it was not, Mr. Barrineau

2   would avoid water activities altogether.

3      11.   I communicated my consultant's conclusions to Mr.

4   Fitzgerald    and    Mr.    Berline    during    our    settlement

5   discussions.  Based on my discussions with my consultant, I

6   concluded that Mr. Barrineau had, in fact, suffered from

7

8   PTSD which was contributed to by the diving accident as

9   well as other unrelated personal problems but that we had a

10  strong case to be presented at trial that his symptoms had

11  largely resolved within a one year period after the

12  incident  and  that  his  prognosis  for  the  future  was

13

14  positive.  This was the position I intended to take at

15  trial  and  this  was  the  position  I  conveyed  to  Mr.

16  Fitzgerald and Mr. Berline.

17

18      Further, affiant sayeth naught.

19  DATED: NOVEMBER 22, 2006

20                              THOMAS C. STERLING, CNMI BAR NO. F0127

21      SUBSCRIBED AND SWORN to before me this 22nd day of
    November, 2006 by THOMAS C. STERLING.

22

23  NOTARY PUBLIC

24

25  ATTACHMENTS: EXHIBITS "A" – "G"

26  E62\73061-01
    G:\WORDDOC\PLD\TCS\303-AFFIDAVIT OF TCS IN SUPP OF MTN 4
    APPROV OF GOOD FAITH SETTLEMENT RE BARRINEAU V PMT.DOC

JENNIFER D. S. MENDIOLA
NOTARY PUBLIC
In and for Guam, U.S.A.
My Commission Expires: Apr. 13, 2009
1008 Pacific News Building, 238 Archbishop
F.C. Flores St., Hagatna, Guam 96910

- 6 -

1    CARLSMITH BALL LLP

2    DAVID LEDGER (CNMI BAR NO. F0195)
     Carlsmith Ball LLP Building
3    Capitol Hill
     Post Office Box 5241
4    Saipan, MP 96950-5241
     Tel No. 670.322.3455
5

6    Attorneys for Defendant
     Cabras Marine Corporation

7

8                 UNITED STATES DISTRICT COURT

9                         FOR THE

10             NORTHERN MARIANA ISLANDS

11    JOHN BRADY BARRINEAU,          CIVIL ACTION NO. CV05-0028

12             Plaintiff,

13        vs.                    **DEFENDANT CABRAS MARINE**
                                      **CORPORATION'S FIRST REQUEST**
14    PROMARINE TECHNOLOGY and       **FOR ANSWERS TO**
     CABRAS MARINE CORPORATION,     **INTERROGATORIES TO**
15                                         **DEFENDANT PROMARINE**
            Defendants.            **TECHNOLOGY; CERTIFICATE OF**
16                                         **SERVICE**

17

18    CABRAS MARINE CORPORATION,

19             Cross-Claim Plaintiff,          R E C E I V E D

20        vs.                             JAN 2 6 2006

21    PROMARINE TECHNOLOGY,       BLAIR STERLING JOHNSON
                                  MOODY MARTINEZ & LEON GUERRERO
22            Cross-Claim Defendant.         A PROFESSIONAL CORPORATION

23    **TO:**    **CROSS CLAIM DEFENDANT PROMARINE TECHNOLOGY**
            **AND ITS ATTORNEY OF RECORD,**
24

25        **Thomas C. Sterling, Esq.**
         **Blair, Sterling, Johnson, Moody, Martinez & Leon Guerrero, P.C.**
26        **Suite 1008, Pacific News Building**
         **238 Archbishop Flores Suite**
27        **Hagåtña, Guam 96910**

28

4815-9318-3232.1.052540-00009

**EXHIBIT "A"**

COPY

13.    If additional space is required for the answer to any Interrogatory, complete the answer on additional sheet(s) of paper bearing the same number as the number of the Interrogatory that is being answered.

14.    Please note that ProMarine, pursuant to Fed. R. Civ. P. 26(e), is under a continuing duty to seasonably supplement its responses with information that is obtained or became available subsequent to the preparation and filing of the responses.

15.    Each of these definitions and instructions is hereby incorporated into each of the Interrogatories to which it pertains.

<u>INTERROGATORIES</u>

<u>INTERROGATORY NO. 1</u>: For each employee ProMarine had on board the M/V CAJUN at the time of the incident, provide the following information:

a.    full name

b.    date of birth

c.    social security number

d.    current residence address

e.    current employer

<u>Answer</u>:


<u>INTERROGATORY NO. 2</u>: For each employee ProMarine had on board the CAJUN at the time of the incident, provide the following information:

a.    description of job

b.    description of credentials or certificates held (for example, commercial diver certification)

1    Answer:

2

3    INTERROGATORY NO. 3: Identify each witness known to you who has any

4    knowledge -- eye-witness or otherwise -- relating to the incident.

5        Answer:

6

7

8    INTERROGATORY NO. 4:  Omitted.

9

10    INTERROGATORY NO. 5: Describe and how or why the accident occurred.   For

11    example, if air supply equipment malfunctioned or for some reason stopped working, describe

12    such as best you can.

13        Answer:

14

15

16    INTERROGATORY NO. 6:  Regarding your Affirmative Defenses Nos. 2, 3 and 4, list

17    all facts you have to support your allegations that Cabras Marine was negligent.

18        Answer:

19

20

21    INTERROGATORY NO. 7:        Omitted.

22    INTERROGATORY NO. 8:        Omitted.

23    INTERROGATORY NO. 9:        Omitted.

24    INTERROGATORY NO. 10:        Omitted.

25        Answer:

26

27

28

4815-9318-3232.1.052540-00009                    7.

1      <u>INTERROGATORY NO. 11</u>:    With regard to paragraph 18 of Plaintiff's

2  Complaint, was ProMarine the owner of "all of the equipment necessary to complete the

3  underwater mission of scrubbing the hull of the M/V Hague, including the air supply used for

4  Plaintiff Barrineau's dive."

5      <u>Answer</u>:

6

7

8      <u>INTERROGATORY NO. 12</u>:    With regard to paragraph 18 of Plaintiff's

9  Complaint, was ProMarine responsible for maintaining and servicing "all of the equipment

10  necessary to complete the underwater mission of scrubbing the hull of the M/V Hague, including

11  the air supply used for Plaintiff Barrineau's dive"?

12      <u>Answer</u>:

13

14

15      <u>INTERROGATORY NO. 13</u>:    With regard to paragraph 18 of Plaintiff's

16  Complaint, did ProMarine operate "all of the equipment necessary to complete the underwater

17  mission of scrubbing the hull of the M/V Hague, including the air supply used for Plaintiff

18  Barrineau's dive"?

19      <u>Answer</u>:

20

21

22      <u>INTERROGATORY NO. 14</u>:    With regard to paragraph 19 of Plaintiff's

23  Complaint, did ProMarine own "the dive compressor aboard the M/V Cajun"?

24      <u>Answer</u>:

25

26

27

28

INTERROGATORY NO. 15:

a.    With regard to paragraph 19 of Plaintiff's Complaint, did an employee of Pro Marine operate "the dive compressor aboard the M/V Cajun"?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 16:

a.    With regard to paragraph 19 of Plaintiff's Complaint, did an employee of Pro Marine service or maintain "the dive compressor aboard the M/V Cajun?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 17:

a.    With regard to paragraph 21 of Plaintiff's Complaint, was an employee of Pro Marine responsible for maintaining "Plaintiff Barrineau's air supply" during the hull scrubbing?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 18:        Omitted.

INTERROGATORY NO. 19:        Omitted.

INTERROGATORY NO. 20:        Omitted.

INTERROGATORY NO. 21:        Omitted.

THOMAS C. STERLING
BLAIR STERLING JOHNSON MOODY
    MARTINEZ & LEON GUERRERO, P.C.
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Telephone:  (671) 477-7857
Facsimile:  (671) 472-4290

THOMAS E. CLIFFORD
Attorney at Law
2nd Floor Alexander Building, San Jose
P.O. Box 506514
Saipan, MP 96950
Telephone:  (670) 235-8846/7
Facsimile:  (670) 235-8848

*Attorneys for Defendant Pro Marine Technology*

## IN THE DISTRICT COURT FOR THE
## THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOHN BRADY BARRINEAU,<br><br>                    Plaintiff,<br><br>    vs.<br><br>PRO MARINE TECHNOLOGY and<br>CABRAS MARINE CORPORATION,<br><br>                    Defendants.<br>_____<br>CABRAS MARINE CORPORATION,<br><br>          Cross-Claim Plaintiff,<br>    vs.<br><br>PROMARINE TECHNOLOGY,<br><br>          Cross-Claim Defendant. | CIVIL ACTION NO. 05-0028<br><br>**DEFENDANT PRO MARINE<br>TECHNOLOGY'S RESPONSES TO<br>CABRAS MARINE CORPORATION'S<br>FIRST SET OF INTERROGATORIES** |

**TO DEFENDANT AND CROSS-CLAIM PLAINTIFF CABRAS MARINE**
**CORPORATION AND ITS ATTORNEYS OF RECORD:**

COMES NOW Defendant **PRO MARINE TECHNOLOGY** (hereinafter

"Pro Marine") and provides the following responses to **CABRAS**



RECEIVED
CARLSMITH BALL
DATE 02-29-06  TIME  11-34am    ORIGINAL

1  **MARINE    CORPORATION'S**    (hereinafter    "Cabras    Marine")

2  Interrogatories served herein on January 26, 2006.

3  ### RESPONSES TO INTERROGATORIES

4  **INTERROGATORY NO. 1**    Please see Exhibit "A" attached hereto.

5  **INTERROGATORY NO. 2**    Please see Exhibit "A" attached hereto.

6

7  **INTERROGATORY NO. 3**    Please  see  individuals  identified  in

8  Exhibit "A" attached hereto.

9  **INTERROGATORY NO. 5**    During  the  dive  operation,  Pro  Marine

10  was  using  the  Intispiro  AGA  full-face  diving  mask  system

11

12  with a color coding system.  There was a black AGA mask and

13  a white AGA mask.  In addition, there were two umbilical

14  hoses,  each  complete  with  a  retrieval  line  and  a

15  communications line.  One of the hoses is coded with black

16

17  banding  for  use  with  the  black  mask,  the  other  hose  has

18  white banding for use with the white mask.  Somehow, the

19  dive  team  had  installed  the  white  mask  on  the  black  hose

20  and  vice-versa.  As such, when a problem occurred on the

21

22  white AGA mask that required the mask to be taken off-line,

23  Mr. Collard on the deck turned off the umbilical hose that

24  was  coded  with  white  banding,  it  actually  turned  off  the

25  air  supply  to  Mr.  Barrineau  who  was  diving  with  the  black

26  mask.

- 2 -

**INTERROGATORY NO. 6**   Pro Marine's affirmative defenses based upon the alleged negligence of Cabras Marine are solely based upon the allegations made by the plaintiff in its complaint that Cabras Marine was negligent.   Pro Marine presently has no knowledge of any facts supporting the contention that Cabras Marine was negligent in connection with this accident.

**INTERROGATORY NO. 11**   Yes, except for the M/V Cajun.

**INTERROGATORY NO. 12**   Yes, except for the M/V Cajun.

**INTERROGATORY NO. 13**   Yes, except for the M/V Cajun.

**INTERROGATORY NO. 14**   Yes.

**INTERROGATORY NO. 15**

    (a)   Yes.

    (b)   The employees actually involved in the operation of the air supply system, which cannot properly be characterized as a dive compressor, were Ben Matanane, Carey Rose, and Ken Collard.

**INTERROGATORY NO. 16**   Objection.   Interrogatory No. 16 is vague and ambiguous due to the use of the undefined terms "service or maintain" and the utilization of the term "dive compressor" which does not adequately identify the actual system utilized by Pro Marine for providing an air supply

- 3 -

18 05 03:57p    ProMarine Technology    1-871-   7002    p.1

# CERTIFICATE OF INSURANCE

ISSUE DATE (MM/DD/YY)
MAY 31 05

| PRODUCER | Cert#3098 |
|---|---|
| TAKAGI & ASSOCIATES, INC. P.O. BOX 22409 GMF AGANA, GU 96921 (671) 646-5350 FAX (671) 646-5373 | |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

### COMPANIES AFFORDING COVERAGE

| COMPANY LETTER | A | AIOI INSURANCE CO., LTD. |
|---|---|---|
| COMPANY LETTER | B | NAVIGATORS INSURANCE COMPANY |
| COMPANY LETTER | C | |

INSURED  PRO MARINE TECHNOLOGY

P.O. BOX 11021
TAMUNING, GU 96931

| COMPANY LETTER | D | |
|---|---|---|
| COMPANY LETTER | E | |

### COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| B | **GENERAL LIABILITY** | SF05LIA459741 | MAY 01 05 | MAY 01 06 | BODILY INJURY OCC | $ |
| | X  COMPREHENSIVE FORM | | | | BODILY INJURY AGG | $ |
| | X  PREMISES/OPERATIONS | | | | PROPERTY DAMAGE OCC | $ |
| | UNDERGROUND EXPLOSION & COLLAPSE HAZARD | | | | PROPERTY DAMAGE AGG | $ |
| | X  PRODUCTS/COMPLETED OPER. | | | | BI & PD COMBINED OCC | $  1,000,000 |
| | CONTRACTUAL | | | | BI & PD COMBINED AGG | $ |
| | INDEPENDENT CONTRACTORS | | | | PERSONAL INJURY AGG | $ |
| | BROAD FORM PROPERTY DAMAGE | | | | BROAD FORM AGG | $ |
| | PERSONAL INJURY | | | | | |
| A | **AUTOMOBILE LIABILITY** | BAP-00309 | MAY 1 05 | MAY 01 05 | BODILY INJURY (Per Person) | $  N/A |
| | ANY AUTO | | | | | |
| | ALL OWNED AUTOS (Priv Pass) | | | | BODILY INJURY (Per Accident) | $  N/A |
| | ALL OWNED AUTOS (Other than Priv Pass) | | | | | |
| | HIRED AUTOS | | | | PROPERTY DAMAGE | $  N/A |
| | NON-OWNED AUTOS | | | | | |
| | GARAGE LIABILITY | | | | BODILY INJURY & PROPERTY DAMAGE COMBINED | $  100,000 |
| | X  SPECIFICALLY DESCRIBED AUTOS | | | | | |
| | **EXCESS LIABILITY** | | | | EACH OCCURANCE | $ |
| | UMBRELLA FORM | | | | AGGREGATE | $ |
| | OTHER THAN UMBRELLA FORM | | | | | |
| A | **WORKER'S COMPENSATION** AND **EMPLOYERS' LIABILITY** | WC-00175 | MAY 1 05 | MAY 01 06 | XX  STATUTORY LIMITS  GUAM FL-80 | |
| | | | | | EACH ACCIDENT | $  100,000 |
| | | | | | DISEASE-POLICY LIMIT | $ |
| | | | | | DISEASE-EACH EMPLOYEE | $ |
| B | **OTHER** MARINE AND PREMISES: $1,000,000 COMBINED SINGLE LIMIT (NO AGGREGATE) (INCLUDES POLLUTION LIABILITY) | SF05LIA459741 | MAY 1 05 | MAY 1 06 | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

BAP-00309 INCLUDES MEDICAL PAYMENTS OF $2,000. / UNINSURED MOTORISTS $25,000./$50,000.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PORT AUTHORITY OF GUAM 1026 CABRAS HIGHWAY SUITE 201 PITI, GUAM 96915 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL  30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE |

# EXHIBIT "B"

Aug-30-06  05:10pm  From-LAW OFFICES ●            6702335262     ●     T-127  P.02/03  F-943

# BRUCE BERLINE
ATTORNEY AT LAW

**LAW OFFICE OF BRUCE BERLINE**
SECOND FLOOR, MACARANAS BUILDING
P.O. BOX 5682 CHRB GARAPAN, SAIPAN MP 96950
PHONE (670) 233-3663
FACSIMILE (670) 233-5262

August 30, 2006

*Via Facsimile No. (671) 472-4290*

Thomas C. Sterling, Esq.
KLEMM, BLAIR, STERLING & JOHNSON
Suite 1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagatna, Guam 96910

RECEIVED

AUG 30 2006

RE:    Settlement Offer for Pro Marine Technology
       *John Brady Barrineau v. Promarine Technology and Cabras Marine Corporation,*
       District Court Civil Action No. CV 05-0028

Dear Tom:

As you know, Mr. Fitzgerald and I represent Brady Barrineau, a young man who suffered a brain injury and post traumatic stress syndrome when Mr. Collard turned off his air supply while Mr. Barrineau was underwater, cleaning the hull of the M/V Hauge. That Mr. Collard turned off Brady's air supply is admitted so there is no issue regarding liability.

As for Mr. Barrineau's damages, his injuries have been substantiated by three different mental health professionals. Each mental health professional has provided you with a report specifically explaining and providing medical support for the injuries.

Mr. Barrineau's injuries has, in all probability, ended his commercial diving career - a career that he planned on enjoying for the rest of his working days. Unfortunately, Mr. Barrineau has no other trade skill to rely upon in which to provide for his wife and three children. The injuries have left Brady physically disabled and economically damaged causing hardship to his wife and children as well as himself.

The defendants have now set a date for Mr. Barrineau's IME. This IME will consist of three doctors examining Mr. Barrineau in Hawaii. I can only guess the cost for this but it must be in the neighborhood of $25,000. Thereafter, we will begin the process of taking depositions of lay people and experts in preparation for the upcoming jury trial - another lengthy and expensive proposition requiring attorney's fees and expenses for counsel's off island travel to conduct these depositions. Finally, these experts will have to come out here to testify. Assuming that the defendants use two experts, and they fly out here to testify for even one day each, the cost could easily reach another

# EXHIBIT "C"

Thomas C. Sterling, Esq.
August 30, 2006
Page 2

$25,000. The bottom line, is that taking this matter to trial will be very expensive for the defendants. And since this is a Jones Act case, there really is no way out for the defendants since the U.S. Supreme Court has held that the question of whether Mr. Barrineau is a Jones Act seaman is, except in rare cases, a question for the jury. Thus, if we do not settle, we all will go to trial. I'm no expert in this but it seems like your insurer is looking at a two hundred to three hundred thousand dollar bill to take this to trial and for what, to give a jury that doesn't even have to think about liability the opportunity to award damages to a hard working young man who grew up on Saipan and to his sympathetic wife and two small children? Under these circumstances, a jury could easily award a verdict in excess of one million dollars.

However, as we all know, a jury trial can be risky for both side despite how compelling the facts are for the Plaintiff, thus, our enthusiasm and optimism must be tempered by the fact that once the case goes to trial, Mr. Barrineau is at the mercy of the jury.

In contrast, a pre-trial settlement with the defendants will allow a fair allocation of fault, and avoid the expense and uncertainty that accompanies a jury trial. Our client would rather settle this matter with Defendant Pro Marine Technology now than subject his case to such risk.

Accordingly, in an effort to eliminate the risk that trial exposes the parties to, we are making the following offer to compromise this case, as against Defendants Pro Marine Technology, Ken Collard and Chie Collard only, as follows. After consulting with Mr. Barrineau, he has decided, in order to effect a final and immediate settlement of this matter, as against Defendants Pro Marine Technology, Ken Collard and Chie Collard only to accept a lump sum payment in the amount of one hundred thousand dollars (U.S. $100,000.00) from Defendants Pro Marine Technology, Ken Collard and Chie Collard only. We would also request a non-disparagement clause in the settlement agreement, if this offer is accepted.

This offer will be remain open until 4:30 p.m. on September 8, 2006 (Saipan time). An acceptance of this offer must be in writing and received by this office or by Mr. Fitzgerald's office on or before the above deadline. This offer will expire on the above date and time, on its own, without any further action needed on our part.

This letter is for settlement discussion purposes only and as such is inadmissible in court for any purpose. We hope to hear favorably from you soon.

With kind regards,

BRUCE BERLINE
WILLIAM FITZGERALD
Attorneys for Plaintiff

CF

WILLIAM J. BLAIR
THOMAS C. STERLING
RICHARD L. JOHNSON
THOMAS C. MOODY, III
JEHAN'AD G. MARTINEZ
VINCENT E. LEON GUERRERO

JAMES F. BALDWIN
NICOLAS E. TOFT
OF COUNSEL
J. BRADLEY KLEMM

LAW OFFICES
**BLAIR STERLING JOHNSON**
MOODY MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION

SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205

TELEPHONE:
(671) 477-7857

FACSIMILE:
(671) 472-4290

WRITER'S E-MAIL:
tcsterling@kbsjlaw.com

September 5, 2006

**VIA FACSIMILE**

William M. Fitzgerald, Esq.          Bruce Berline, Esq.
LAW OFFICES OF WILLIAM               LAW OFFICE OF BRUCE BERLINE
  M. FITZGERALD                      Post Office Box 5682 CHRB
Post Office Box 500909               Saipan MP 96950
Macaranas Building, 1st Floor        **FAX NO. (670) 233-5262**
Garapan, Saipan MP 96950
**FAX NO. (670) 234-7530**

          RE:  *BARRINEAU V. PRO MARINE TECHNOLOGY, ET AL.*

Dear Bill and Bruce:

     Please be advised that your $100,000 settlement offer as
to Pro Marine and Mr. and Mrs. Collard conveyed in Bruce's
letter of August 30, 2006 is hereby accepted.

     I will prepare the proposed Stipulation and Order to
dispose of the pending claims in the District Court action as
well as a standard Release which will serve to dispose of all
potential claims.  In the meantime, I would be most
appreciative if you could advise me as to how you would like
the settlement check drawn since I have been advised that the
check can be issued very quickly.

     Please do not hesitate to give me a call should you wish
to discuss these matters in greater detail.  Thank you for
your courtesy and cooperation in connection with this
settlement.

                         Very truly yours,

                         BLAIR STERLING JOHNSON
                         MOODY MARTINEZ & LEON GUERRERO
                         A Professional Corporation



                         THOMAS C. STERLING

cc:  Mr. Tim Lujan (via e-mail)
     Ken and Chie Collard (via e-mail)
     Thomas E. Clifford, Esq. (via e-mail)
     David P. Ledger, Esq. (via e-mail)

E62\73061-01
G:\WORDDOC\LTR\TCS\1165-W M FITZGERALD & B BERLINE
(FAX) RE BARRINEAU V PRO MARINE TECHNOLOGY.DOC          **EXHIBIT "D"**

**TAKAGI & ASSOCIATES, INC.**
**AIOI INSURANCE CO., LTD.**
**LOSS ACCOUNT**
P.O. BOX 22409 GMF, GUAM 96921

23219

BANK OF GUAM
P.O. BOX EW
HAGÅTÑA, GUAM 96932

101-511/1214

SEP 15 2006

PAY TO THE
ORDER OF _____ William M. Fitzgerald (Trust Account) in behalf of BARRINEAU, JOHN _____ | $ **100,000.00

_____ One Hundred Thousand dollars only _____ DOLLARS

William M. Fitzgerald (Trust Account) in behalf of BARRINEAU, JOHN
c/o 1st Floor, Macaranas Bldg.
P.O. Box 909
Guam

MEMO _ Full & Final Payment

⑈0 2 3 2 1 9⑈ ⑆1 2 1 4 0 5 1 1 5⑆ 0 1 0 1⑈1 7 9 1 6 5⑈

**EXHIBIT "E"**

# RELEASE

### KNOW ALL MEN BY THESE PRESENTS:

That for and in consideration of the sum of **ONE HUNDRED THOUSAND DOLLARS ($100,000.00)** in lawful money of the United States and other good and valuable consideration, this day paid to **JOHN BRADY BARRINEAU** (hereinafter "PAYEE"), receipt of which is hereby acknowledged, said PAYEE does by these presents remise, release and forever discharge **PRO MARINE TECHNOLOGY, KENNETH COLLARD, CHIE N. COLLARD, AND AIOI INSURANCE COMPANY, LTD.** (hereinafter "PAYOR"), their agents, servants and employees, and each of them, and all other persons, firms, corporations, associations or partnerships having any interest in or in any way connected with said PAYOR of all claims and demands for damages of every kind and nature whatsoever and whether now known or unknown, including any and all claims for costs, loss of service, expenses, and wages earned and unearned, and for subsistence, maintenance, cure, and care, both past and future which the said PAYEE shall or may have against PAYOR, or any of the above named persons, firms, corporations, associations or partnerships by reason of or arising out of that diving accident, casualty or event which occurred on or about May 22, 2005 in Apra Harbor, Guam, involving the parties hereto, and particularly but without lessening or limiting the force or generality of the foregoing, from all claims and demands set forth in that certain action entitled *John Brady Barrineau v. Pro Marine Technology, et al.,* United States District Court for the NMI, Civil Action NO. 05-0028.

The undersigned further declares and represents that this Release expresses a full and complete settlement of a liability claimed and denied and, regardless of the adequacy of the compensation, is intended to avoid litigation, and that there is absolutely no promise, inducement or agreement on the part of PAYOR to make any payment or do any act or thing other than is herein expressly stated and clearly agreed to, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

PAYEE further jointly and severally agrees to indemnify, defend and hold harmless PAYOR, their agents, servants, and employees, and each of them, and all other persons, firms, corporations, associations, or partnerships, having any interest in or in any way connected with said PAYOR from and against any and all loss, liability, and expense of whatsoever

INITIAL _____

# EXHIBIT "F"

kind or nature including but not limited to attorneys' fees which may arise from the assertion by PAYEE of any claim against anyone arising out of the above indicated occurrence; provided, however, that this obligation does not extend to any claims which have been or may be asserted by Cabras Marine Corporation.

The undersigned hereby declares that he has read the foregoing Release and that the meaning thereof has been explained to him by his attorney, who has also caused this document to be executed and he fully understands and appreciates the meaning hereof, and has executed the same of his own free will and accord.

PAYEE further acknowledges that:

1.    This Release consists of three (3) pages, each of which has been initialed by PAYEE at the lower right corner.

2.    A copy of the Release has been retained by PAYEE.

3.    Where appropriate, the masculine gender shall include the feminine and neuter, and the singular shall include the plural.

DATED this 27 day of September, 2006.

_____
JOHN BRADY BARRINEAU

### ATTORNEY'S CONSENT

I have read the foregoing Release and approve it as to substance and as to form and have advised my client, JOHN BRADY BARRINEAU, to execute it.

LAW OFFICES OF WILLIAM M. FITZGERALD

BY: _____
WILLIAM M. FITZGERALD
*Attorneys for Payee*

- 2 -

INITIAL _____

Sep-29-06  10:55am    From-LAW OFFICES SAIPAN                +670-234-7530            T-053  P.04/04  F-014

# ACKNOWLEDGEMENT

COMMONWEALTH OF THE               )
NORTHERN MARIANA ISLANDS          )
                                  ) ss:
SAIPAN                            )

ON THIS $\underline{27^{th}}$ day of September, 2006, before me, a notary public in and for the Commonwealth of the Northern Mariana Islands, personally appeared **JOHN BRADY BARRINEAU**, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_(official signature and seal of notary)_

£68:62\73061-01
G:\WORDDOC\DOC\TCS\133-RELEASE RE
BARRINEAU V. PROMARINE DOC

**MARK B. HANSON**
NOTARY PUBLIC
Commonwealth of the Northern Mariana Islands
My Commission Expires: _DEC 8 200C_
P.O.Box 5682 CHRB  Saipan, MP 96950

- 3 -

INITIAL



_Janet L. McCullough, Ph.D._

P.O. Box 5218 CHRB  •  Saipan, MP 96950  •  (670) 323-3221  •  FAX (670) 323-3220  •  janetmcc@itecnmi.com

Licensed Clinical Psychologist
#004

June 28, 2006

## Psychological Evaluation and Treatment Summary

**Name:**               John Brady Barrineau
**DOB:**                11-22-70
**Age at initial interview:**    34 years

**Referred by:**                    William Hay, MD

**Reason for Referral:**

Mr. Barrineau was referred for psychological services by his attending psychiatrist, Dr. William Hay. Dr. Hay had initially seen Mr. Barrineau on May 24, 2005, two days after Mr. Barrineau was injured in a diving incident on Guam. At the time of the referral (approximately three weeks after the incident) Dr. Hay had diagnosed Mr. Barrineau with Acute Stress Disorder and having experienced a "traumatic event secondary to a work place safety issue" (see Hay report, May 24, 2005). Shortly after referring Mr. Barrineau for psychological services, Dr. Hay revised the diagnosis to Acute Post Traumatic Stress Disorder (PTSD) since one month had passed since the diving incident and the symptoms now qualified for a diagnosis of PTSD. Dr. Hay additionally diagnosed Mr. Barrineau with a cognitive disorder, anoxic head injury with trauma and cited psychosocial stressors of being unemployed as a result of having been terminated following the diving incident (see Hay report, June 22, 2005). Dr. Hay referred Mr. Barrineau for psychotherapy including possible EMDR therapy (a type of therapy often used in the treatment of PTSD). At the time of the referral, Dr. Hay was providing ongoing psychiatric and pharmacological treatment to Mr. Barrineau.

**Report requested by:**      Bruce Berline, attorney

This report was requested by Mr. Bruce Berline, attorney at law. Mr. Berline is representing Mr. Barrineau in a lawsuit related to the diving incident; this report was requested by Mr. Berline to provide a summary of the ongoing psychological services that Mr. Barrineau continues to receive as well as a review of Mr. Barrineau's psychological functioning at the time of his initial referral by Dr. Hay as well as his current level of functioning.

**Dates of service:**

Psychological services have been provided on an ongoing basis since the initial referral in June 2005. The dates of service are listed in an attachment to this report (see Appointment History). In summary, Mr. Barrineau has been seen to date a total of 24 times for individual appointments (a total of 28.75 hours) and 4 times with his wife, Ms. Julie Sarich (5.5 hours). Ms. Sarich has attended 5 individual appointments (in part to provide collateral information). There was also a group meeting held in September 2005 attended

## EXHIBIT "G"

941



**Barrineau, John Brady**
**Psychological Evaluation and Treatment Summary**
**Page 2**

by Mr. Barrineau and his wife, as well as Mr. Berline. At this meeting Dr. Pamina Hofer, a neuropsychologist from Guam, presented her findings and recommendations regarding her evaluation of Mr. Barrineau.

It is expected that psychological services will be continuing for an extended period of time.

**Sources of information:**

- Self-report, clinical interviews and observations
- Collateral data provided by Ms. Julie Sarich (Mr. Barrineau's wife)
- Review of reports by Dr. William Hay (May 24, 2005 and June 22, 2005)
- Presentation of findings by Dr. Pamina Hofer (September 3, 2005) and review of her recommendation letter (April 25, 2006)

**Organization of this report:**

Due to the number of psychotherapy appointments attended by Mr. Barrineau, as well as the time period over which they were scheduled, a considerable amount of information has been collected. For the purposes of this report, information will not be referenced to the specific session from which it was obtained unless there is particular relevance in noting a specific date or time frame.

This report will first summarize the presenting problem and initial symptoms. This is followed by initial behavioral observations and a brief mental status report. A brief overview of Mr. Barrineau's family and social history will then be presented. Psychological and emotional functioning prior to the diving incident as well as immediately following the incident will be presented. This includes a discussion of the psychosocial stressors and difficulties that are, or have been, experienced as a result of the diving accident. A summary of the focus of therapy and treatment goals will then be presented followed by a discussion of Mr. Barrineau's current psychological functioning. Suggestions and recommendations conclude this report.

**Presenting Problem:**

Mr. Barrineau was involved in a diving incident on Guam on May 24, 2005 while working as a commercial diver. According to Mr. Barrineau, he was working underneath a ship at an approximate depth of 40 feet when his air supply was turned off at the source (on a boat at the surface). Mr. Barrineau reported that as he attempted to free himself of the heavy equipment he was using, he was pulled down to an even greater depth (estimated by him to be 80 feet). As he made an emergency ascent, he lost consciousness prior to reaching the surface; it appears that he sustained a closed head injury as he surfaced, most likely hitting his head on the underside of the ship. Mr. Barrineau recalls seeing vividly the faces of his two young daughters. He reports that he knew he was struggling to survive in a life-threatening situation. Upon surfacing, Mr. Barrineau remembers feeling "elated" upon surfacing. He also remembers that soon afterwards he "did not feel like himself".

Following this incident, Mr. Barrineau returned to Saipan where he was medically evaluated. He continued to feel disoriented, "in a daze" and "weak". It was at this time (two days post-accident) that Mr.

942

Barrineau, John Brady
**Psychological Evaluation and Treatment Summary**
Page 3

Barrineau was first evaluated and treated by Dr. William Hay, a psychiatrist employed at the Commonwealth Health Center. Dr. Hay referred Mr. Barrineau for psychological services approximately three weeks after the diving accident.

Mr. Barrineau was initially quite uncomfortable being in a psychologist's office and stated numerous times that he had never imagined needing mental health services. He had a self-image of being strong, competent and self-sufficient; clearly this self-perception was challenged by his needing psychological services, an action which he perceived to be a sign of weakness and vulnerability.

At the time of his first appointment, (June 17, 2005) and during several subsequent appointments, Mr. Barrineau was experiencing considerable distress and numerous debilitating symptoms. He complained of having difficulty sleeping and of having repeated thoughts, memories and images of the diving accident. He complained of having bad dreams and nightmares, many of which were directly related to the diving incident. He was distressed by not being able to work and was particularly distressed that he felt completely uncomfortable getting back into the water; putting his face into the water of a swimming pool seemed terrifying.

Mr. Barrineau reported that even simple tasks were difficult, that he could "no longer remember basic things" and cited an example where he had forgotten he had his daughter with him at a local video store. He related that his friends and family described him "as being different now", looking differently (an "emptiness" to his eyes), and acting "like a zombie". He reported feeling irritable, tired and "scatter brained". Mr. Barrineau clearly stated that he wanted to "get my life back", start working again, and to "be myself again".

**Behavioral Observations:**

Mr. Barrineau typically attends his appointments casually, neatly and appropriately dressed. During the first several months of appointments he frequently appeared anxious and distressed. He had difficulty sitting still and tended to speak rapidly and to often repeat himself. Mr. Barrineau has always been cooperative; once adequate rapport was established and he felt more comfortable with the concept of seeing a psychologist, he was eager to receive help.

During the initial months of therapy, Mr. Barrineau demonstrated considerable cognitive and memory deficits. He often needed to phone to verify appointment dates and times. He demonstrated decreased concentration and attention. He was impulsive and evidenced impaired judgment. During his appointments, he experienced both physical and mental fatigue at a faster rate than would be expected of someone his age. Mr. Barrineau was frequently aware of these deficits and limitations as he is intelligent and has adequate insight; this was a source of increased frustration and sadness for him.

**Mental Status:**

Throughout all of his appointments, Mr. Barrineau has demonstrated appropriate behavior. His affect was initially variable and at times quite intense. His mood was quite depressed during the initial months of treatment; there has been a gradual improvement and in general, there has been a depressed quality. As mentioned above, Mr. Barrineau's ability to concentrate is impaired, although recent months have shown some improvement. He has always been oriented to person, place and time. Memory,

943

**Barrineau, John Brady**
**Psychological Evaluation and Treatment Summary**
**Page 4**

especially recent memory, has been impaired with some improvement in recent months. There is no evidence of thought disturbance or delusional thinking; he denies any homicidal or suicidal thoughts (although he reported having some brief thoughts of suicide very soon after the accident). Judgment was quite impaired initially with high impulsivity and poor decision making skills; there have been some improvements in recent months but there is still marked impairment..

**Background Information, Family and Social History:**

Mr. Barrineau was 34 years old at the time of the initial appointment one year ago. At that time he had been living on Saipan for 3 years. His family (parents and one younger sister) are long-time residents of Saipan, as was Mr. Barrineau prior to moving to the US mainland to attend college, diving school and to work as a commercial diver. He has been married to Ms. Julie Sarich since 2000; they knew each other for five years prior to their marriage. Ms. Sarich is a special education teacher. They have two daughters who were born in 2002 and 2005 (they were 3 years old and 6 months old at the time of Mr. Barrineau's diving accident). He and his wife own their own home.

Mr. Barrineau describes himself as close to family, especially his mother. It is important to note that his mother passed away six months ago, several months after Mr. Barrineau's diving accident. The effect of her death and its psychological impact will briefly be discussed in a later section.

Prior to the diving incident, the most serious and difficult life stressor that Mr. Barrineau had experienced was a fatal motor vehicle/pedestrian accident in which he was the driver. He was not at fault and he was not cited. This accident, which occurred many years ago, is still difficult for Mr. Barrineau to discuss.

Mr. Barrineau does not smoke or use drugs. He is a social drinker and he acknowledges that he is at higher risk to abuse or self-medicate with alcohol due to a family history of heavy alcohol use. He is in excellent physical shape; prior to his diving accident he regularly exercised and worked out as well as getting considerable exercise through the physical demands of his work as a commercial diver. There is no known psychiatric history or drug and alcohol treatment history in Mr. Barrineau's family.

**Prior Functioning:**

As mentioned previously, prior to the accident in May 2005, Mr. Barrineau was a physically active and socially outgoing person. He was employed on Guam as a commercial diver, spending weekends at home with his family on Saipan. In addition to his employment as a commercial diver, Mr. Barrineau also owned and operated a recreational dive shop on Saipan. Much of his leisure time activities focused on water and water sports. He enjoyed diving, fishing, boating, computer graphics, and spending time with his wife and children. He and his wife had recently purchased a condominium close to his parents' unit and they were looking forward to refurbishing it and moving.

Mr. Barrineau considered himself to be physically fit and highly competent at recreational and commercial diving. He had received extensive training in diving and possesses several diving credentials and certifications (e.g., Marine Diving Technician certificate, NAUI dive instructor, hyperbaric medicine diving, licensed Coast Guard captain). He states that diving and being a commercial diver "had been a passion and a dream" for many years. He persisted in accomplishing his goals even though he knew his

944

Barrineau, John Brady
Psychological Evaluation and Treatment Summary
Page 5

family (especially his father) wanted to see him pursue higher education and a "more respected, traditional career".

Prior to the accident Mr. Barrineau saw himself as a competent, independent person. He valued self-sufficiency and took pride in his career and his achievements. He describes himself as someone who was in a "macho type career" and that asking for help from others (such as seeking psychological services) is not valued and is in fact, looked down upon. He felt he had a positive outlook on life and had plans and goals for his career and with his wife and children.

**Psychological Functioning following the Diving Incident:**

Just prior to the time that Mr. Barrineau first started attending therapy appointments, there had been a considerable and serious change in his level of functioning, both emotional and physical, that coincides with his diving accident on Guam. He initially evidenced an Acute Stress Disorder which was changed to a diagnosis of Post Traumatic Stress Disorder as the systems persisted for more than one month. He continued to exhibit distressing recollections of the traumatic event, disturbing dreams and nightmares, symptoms of distress when discussing the incident, a detached feeling of self, and a loss of interest in usual activities (such as being with friends, attending social events). In addition, Mr. Barrineau continued to report difficulty with sleeping, irritability and low frustration tolerance and profound difficulty with concentration and memory.

In addition to clearly meeting the diagnostic criteria for PTSD (as both Dr. Hay and Dr. Hofer concurred) Mr. Barrineau also exhibited symptoms of depression (as also noted by Dr. Hofer). These symptoms included sleep disturbance, decreased mood, loss of interest in usual activities and a hopeless feeling about the future. After a few initial appointments, it was recommended in a consultation with Dr. Hay that Mr. Barrineau be started on an antidepressant medication to help alleviate the symptoms of depression as well as of PTSD. He showed a generally positive response to the medication with some lessening in the severity of certain symptoms.

In addition to the symptoms related above, Mr. Barrineau initially had considerable difficulty with cognitive functions such as attention, concentration and memory. These deficits were most notable during the first six months of treatment although they continue to be apparent and to interfere with Mr. Barrineau's ability to resume the lifestyle he had prior to the diving incident. There was a significant impairment in his ability to perform daily parenting activities, especially during the first several months. He felt that he was not fully trustworthy taking his children out given the severe memory problems he was experiencing (e.g. the incident noted previously where he started to leave his daughter in a store). He often found himself forgetting where he was going while driving or walking, forgetting what he was intending to do or where he was supposed to be.

Mr. Barrineau has had to make considerable lifestyle adjustments due to his injuries. He not only lost his job but he has not been able to return to diving following the findings and recommendations of Dr. Hofer, his evaluating neuropsychologist. As presented by Dr. Hofer in a meeting September 3, 2005, the brain injury suffered during the accident presents considerable safety risks if he continues to dive. In addition, the anxiety that he suffers following exposure to such trauma also places him at high risk if he is in a diving situation. Even if Mr. Barrineau was medically cleared to dive, he continues to experience

**Barrineau, John Brady**
**Psychological Evaluation and Treatment Summary**
**Page 6**

considerable anxiety (although he is less anxious than several months ago) when thinking about being submerged in water or when talking about the accident.

As a result of the accident, Mr. Barrineau has experienced numerous life changes (e.g., being unemployed, being unable to dive recreationally or commercially, having cognitive changes and deficits). These changes have caused considerable psychosocial stress for both Mr. Barrineau and his wife. They have experienced serious financial stress as he is no longer employed as a commercial diver. He has experienced a difficult change in his perception of himself as much of his self-image and self-worth was derived from his work as a diver. This loss in self-esteem has at times been emotionally debilitating for Mr. Barrineau and has contributed to his depression. In addition, Mr. Barrineau has experienced considerable stress due to an ongoing legal case related to the diving incident. This stress has contributed to his anxiety, sleep disturbances, ability to concentrate and overall mood. It is also important to note that the effects of the brain injury (as noted by Dr. Hofer) such as fatigability and problems with concentration, attention and memory make it even more difficult for Mr. Barrineau to cope with these additional stressors. Trying to solve financial problems, review documents relating to the legal case, or finding alternative types of employment are all negatively impacted by the cognitive deficits that Mr. Barrineau has demonstrated.

As mentioned previously, Mr. Barrineau's mother passed away in January 2006 following a few month illness. Clearly her death has contributed to the stress he was already experiencing. It is important to note that all of Mr. Barrineau's clinical symptoms of Post Traumatic Stress Disorder and mood disturbance were exhibited prior to her becoming ill. As a result of his mother's death, Mr. Barrineau has been experiencing normal and expected grief and increased stress, all of which can clearly be differentiated from his other psychological symptoms. As would be expected, there has been a clear improvement in the grief and adjustment with the passage of time since his mother's death. It is important to note that Mr. Barrineau has exhibited good coping and adaptive skills following his mother's death, indicating his ability to adapt to a stressful, but normal and expected, life situation. Conversely, Mr. Barrineau has had considerable difficulty adapting to a situation which is not normal and was unexpected (i.e., the diving accident). This response is further indication of Mr. Barrineau's overall mental health and coping strengths; he has been able to cope well with usual and typical life stressors. However, he has had considerable difficulty recovering from an experience which exceeds the usual and normal experiences in one's life. This is also consistent with a diagnosis of PTSD which requires exposure to an event which is perceived to be life threatening or will cause serious physical injury.

Mr. Barrineau and his wife have experienced a considerable increase in marital tension and stress during the past year. Clearly the increase in stress and the effects of Mr. Barrineau's accident have put a strain on the marital relationship. Although the death of Mr. Barrineau's mother increased the stress they have experienced, it also helped bring the two of them closer together. The stresses of the financial situation, Mr. Barrineau's underemployment, and the effects of his injuries have had a demonstrable negative effect on their relationship. Both Mr. Barrineau and Ms. Sarich have been counseled together to address these problems and to attempt to strengthen their communication and coping skills. These therapy sessions have also focused on strategies to strengthen their physical and emotional intimacy.

Barrineau, John Brady
**Psychological Evaluation and Treatment Summary**
Page 7

**Summary of Focus of Therapy and Treatment Goals**

During the past year that Mr. Barrineau has been receiving psychological services, there has been a shift on the focus of his treatment. Initially and for the first several months of therapy, treatment focused on supportive and educational therapy. These sessions focused on symptom identification (e.g., assessing symptoms such as sleep disturbance and mood disturbance) with a goal of alleviating symptoms. Referral back to Mr. Barrineau's psychiatrist for antidepressants occurred during this time. Mr. Barrineau had a generally favorable response to the medication and reported improved (but still problematic) sleeping, a reduction in certain anxiety symptoms, and an improvement in some of the depressive symptoms he had been experiencing. A major focus of therapy during the first three months was on assisting Mr. Barrineau cope with the cognitive deficits he was experiencing. For example, he started using a notebook to write down all appointments, errands he needed to do, and tasks he needed to accomplish. This was to help him cope with memory deficits. He was also assisted in recognizing signs of mental fatigue and being able to schedule shorter meetings or asking for breaks during meetings. Another part of Mr. Barrineau's early therapy was to encourage him to learn about his injuries and to be an informed consumer. During these first few months, Mr. Barrineau was in considerable need of having a safe environment to discuss his fears and express his sadness, anger and concerns about the incident, the change in his lifestyle and the uncertainty about his physical recovery and his future. In addition, therapy also focused on education about the potential for marital problems and alcohol abuse (common in situations such as he was experiencing), communication skills, relaxation techniques and anger management techniques.

Therapy has also focused on situational stressors (e.g., his mother's illness and death, family issues, marital issues and employment options) with the therapy being generally more supportive in nature rather than insight oriented psychotherapy. Throughout the year of services, Mr. Barrineau has been motivated and interested in getting help. As mentioned previously, it is anticipated that therapy will continue for some time.

It should be noted that the therapy that was suggested by Dr. Hay during the initial referral (EMDR – Eye Movement Desensitization and Reprocessing) has not been used with Mr. Barrineau as it was determined early in his treatment that he was not a good candidate for this type of therapy. This is partially due to a medical history of having had a "lazy eye" that was surgically treated many years ago but still occasionally bothers Mr. Barrineau when he is fatigued. It was also ruled out as a therapeutic treatment given the current cognitive deficits that he has been experiencing. The usefulness and appropriateness of this treatment method may be reevaluated at some point in the future.

**Current Psychological Functioning**

Mr. Barrineau's current level of psychological functioning continues to be impaired and is not at the level it was prior to his diving accident in May 2005. He has shown some improvement with several symptoms and behaviors that were initially quite distressful and which persisted for several months. He is showing improvements with certain memory functions and reports that he has no longer needs to exert as much as effort as before to remember appointments and tasks (e.g., he no longer must rely on a notebook to remind him of appointments and meetings). He is feeling less depressed and is no longer taking antidepressants (it should be noted, however, that he chose to stop the medication rather than having his physician recommend he do so). He reports significant progress in adjusting to his mother's death although he recognizes that he is still grieving. Mr. Barrineau still reports experiencing occasional nightmares and

947

**Barrineau, John Brady**
**Psychological Evaluation and Treatment Summary**
**Page 8**

scary dreams although less frequently than one year ago. He is generally less angry, irritable and agitated than during the first several months after the accident. Mr. Barrineau continues to be disturbed by thoughts and images of his diving accident. He is still anxious when he thinks about being completely submerged in water although he has been able to play with his children in a swimming pool without the anxiety he experienced in the first several months after he was injured.

He is still experiencing some memory problems, difficulty concentrating, and reports feeling "scattered and disorganized" a considerable amount of time. His wife reports that there have been some improvements but that she continues to observe some impulsivity, irritability, and moodiness that were not there prior to the incident. His memory problems are still evident to her, although she has some limited improvement..

There is significant marital tension and conflict being experienced by both Mr. Barrineau and his wife that goes well beyond the routine and expected minor and manageable marital problems they experienced prior to the diving incident. This is of serious concern as they continue to be at risk for experiencing prolonged marital conflict as Mr. Barrineau's health, employment, and legal case have not been resolved.

Mr. Barrineau's coping strategies at times serve him well. He has been focusing on alternative methods of employment that do not involve diving, such as boating and computer graphic design. These efforts help build his self-esteem, reduce his depression, and also help (although in a fairly minor way) with the family's financial situation. He continues to be somewhat impulsive and is easily distractible and at times easily irritated. He has not adjusted to the possibility that he may not be able to continue his diving career. Although he can discuss it with somewhat less difficulty than in previous months, Mr. Barrineau still longs to be a commercial diver and has had considerable difficulty considering the possibility that his medical and psychological injuries may preclude him from future diving.

**Summary and Recommendations**

Mr. Barrineau experienced a serious, traumatic event when his air supply was shut off while diving commercially on May 24, 2005. As a result, he developed a severe case of Post Traumatic Stress Disorder. In addition, he was diagnosed by Dr. Pamina Hofer with Dementia secondary to combined anoxia and subsequent head injury. As a result of these injuries, he has experienced cognitive deficits including impairments of attention, concentration, memory, and judgment.

He has experienced some significant symptoms of depression as part of the PTSD as well as secondary to several changes in his life (e.g., the loss of his job, his inability to work as a commercial diver, and a significant negative change in his financial situation). In addition, he and his wife are experiencing some moderate marital conflict as they attempt to adjust to these developments and to reorganize their lifestyle and their future goals and plans.

Although Mr. Barrineau's current level of functioning is much improved over his functioning six months ago and particularly, one year ago, it is significantly impaired when compared to his level of functioning that predated his diving accident. While Mr. Barrineau may continue to make some improvements, it is unclear at this time what his eventual level of functioning will be. Dr. Hofer strongly recommends, in addition to other recommendations for various medical tests, that Mr. Barrineau be retested to assess his

948

Barrineau, John Brady
Psychological Evaluation and Treatment Summary
Page 9

current level of neuropsychological functioning. This will allow a comparison to be made between current levels of functioning with previous findings from one year ago. Once these comparisons are made, the prognosis for further improvement in his cognitive and emotional functioning can be made. The outcome of these comparisons will have a significant effect on Mr. Barrineau's overall psychological functioning; if he is showing indications of neuropsychological improvement, he will be more hopeful and optimistic about his future. If, on the other hand, there are indications that he is not making significant improvements, he is likely to experience an exacerbation of his depressive symptoms.

With regard to Mr. Barrineau's Post Traumatic Stress Disorder, there are definitely indications that the symptoms have lessened in the past few months. However, he continues to experience distressful symptoms and the PTSD, although less severe, is still present. It must be emphasized that with PTSD there can be an intensification of symptoms or a reoccurrence of symptoms with no warning. Once an individual experiences PTSD, they are at risk to experience reoccurrences of symptoms throughout their lifetime. Given the inherent risks and dangers involved with diving, there are serious safety and health issues to consider with regard to Mr. Barrineau working as a commercial diver. It is impossible to predict at this point in time whether he will be able to return to commercial diving. More information and tests are needed before the possibility can be considered.

This uncertainty with regard to understanding the full consequences, both physically and emotionally, of the diving injuries exacerbates the anxiety and depression that Mr. Barrineau has been feeling. Although unrelated to the diving incident, the death of Mr. Barrineau's mother earlier this year has been an added source of anxiety, worry and grief.

Mr. Barrineau has made some progress in adjusting to several of the lifestyle changes he has experienced as a result of the accident. He is demonstrating some renewed energy and motivation to seek alternative employment and to work on improving the areas in his marriage that have suffered from these changes. He is slowly adjusting to the possibility that he may have a permanent disability and that he may suffer long term consequences of PTSD. Mr. Barrineau has made some progress in moving from the uncertainty, shock, and denial that he experienced initially after the accident. He still struggles with depression and mourning as he has begun to comprehend the possible changes and losses resulting from his injuries. Hopefully, with time, continued therapy, and the support of his family he will be able to continue to make significant progress in accepting and adapting to a potentially permanent disability.

In conclusion, it should be emphasized that Mr. Barrineau has experienced serious and debilitating symptoms of PTSD and depression as well as serious psychosocial stressors relating to career, employment, financial and marital issues. These are serious and long-term issues that he will be facing for an as yet undetermined time. Although Mr. Barrineau has exhibited some improvement in the severity of his symptoms, he continues to experience a considerable amount of psychological distress resulting from his experiences during the diving incident.

Interviews conducted and report by:

_____
Janet L. McCullough, Ph.D.
Licensed Clinical Psychologist