CARLSMITH BALL LLP

DAVID LEDGER (CNMI BAR NO. F0195)
Carlsmith Ball LLP Building
Capitol Hill
Post Office Box 5241
Saipan, MP 96950-5241
Tel No. 670.322.3455

Attorneys for Defendant
Cabras Marine Corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOHN BRADY BARRINEAU,<br><br>Plaintiff,<br><br>vs.<br><br>PROMARINE TECHNOLOGY and<br>CABRAS MARINE CORPORATION,<br><br>Defendants. | CIVIL ACTION NO. CV05-0028<br><br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT;<br>MEMORANDUM IN SUPPORT<br>THEREOF; DECLARATION OF DAVID<br>LEDGER; EXHIBITS A-D;<br>CERTIFICATE OF SERVICE:<br><br>HEARING: MAY 10, 2007<br>TIME: 9:00 A.M. |

Defendant Cabras Marine Corporation ("Cabras") hereby moves this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. This motion is supported by the attached Memorandum of Points and Authorities and Exhibits A through D, the attached Declaration of David Ledger, and the records and files for this action.

DATED: Hagåtña, Guam, April 5, 2007.

CARLSMITH BALL LLP

/s/ David Ledger
DAVID LEDGER
Attorneys for Defendant
Cabras Marine Corporation

4826-6840-2689.1.052540-00009

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff John Barrineau was at the time in question employed as a commercial diver by Pro Marine Technology. Mr. Barrineau's diving accident occurred when he was diving to clean the bottom of a vessel which was at the time anchored in Inner Apra Harbor, Guam. Mr. Barrineau settled his claims against with Pro Marine Technology for $100,000. Subsequently, the Court ruled that Cabras Marine's cross claim against Pro Marine could not be maintained, and later approved the Barrineau-Pro Marine settlement as a good faith settlement.

Cabras Marine remains in the case as a defendant with Barrineau asserting a number of common law and admiralty claims against Cabras. Each claim, however, suffers from fatal flaws paramount among them being that Cabras Marine was not Barrineau's employer and did not exercise any control or right of control over any equipment, instrumentality or event which caused Barrineau harm. Neither Cabras Marine nor its vessel M/V *CAJUN* played the slightest part in causing Plaintiff's diving accident. The undisputed record clearly demonstrates that Barrineau's injuries were caused solely by Pro Marine Technology ("PMT"), his employer, when PMT's President, Kenneth Collard, admittedly turned off Barrineau's air supply on the mistaken belief that he was turning off the air supply to a diving mask which was not in use. In other words, Mr. Collard intended to turn off an air supply valve, just not the valve supplying air to Mr. Barrineau. The undisputed record demonstrates that Cabras had absolutely no role in causing what happened and was under no duty to prevent it. Rather, as all other parties have admitted, Cabras Marine had no involvement in the events leading to the errant shut-off of Barrineau's air supply. Two Cabras employees were present at the time of the events only because Cabras Marine's vessel *CAJUN* acted as a water taxi to transport PMT employees and their diving

equipment from the dock at Sumay Cove[1] to the dive site at Inner Apra Harbor. Once the vessel arrived at the dive site, its engines and all other mechanical systems were shut down and its crew of two persons waited in the wheelhouse for instructions from PMT to proceed back to Sumay Cove.

For these and the reasons detailed below, Barrineau's claims of unseaworthiness, maintenance and cure, negligence, negligence per se, and negligence under the doctrine of res ipsa loquitur asserted against Cabras have no merit. Summary judgment is appropriate on all counts.

## II.   BACKGROUND

### A.   Barrineau's Alleged Injury.

The evidence is undisputed that on May 22, 2005, Barrineau was employed as a commercial diver by PMT. Ex. A, Response to Interrogatory No. 1. On that day, PMT assembled a dive team to conduct dive operations on the M/V Hauge, a Military Sealift Command ship anchored at Inner Apra Harbor, Guam. In particular, PMT had a contract to clean the bottom of the Hague's hull. To accomplish this divers would enter the water and use a power operated "scrubber" to clean the hull. Since the M/V Hague was not berthed at a shore-side facility, PMT had to hire a water taxi to transport its divers and equipment to and from the Hague. PMT selected the M/V *Cajun*, owned by Cabras, for this purpose and paid Cabras a daily rental for each day PMT worked on the Hague. Ex. B at 22:6-13.

PMT, on its own initiative, approached Cabras about hiring one of its water taxis or work boats to transport its divers and equipment to and from the Hague. When PMT went to Cabras for this purpose PMT was familiar with Cabras' fleet and had a particular vessel in mind, the M/V PATRIOT. However, Cabras told PMT that the PATRIOT was on another job and not

---

[1] Sumay Cove is located at the U.S. Naval Base on Guam.

available. Ex. B at 91:8-18. Faced with this situation, PMT made a deliberate decision to hire the *CAJUN* instead of the PATRIOT even though PMT knew the PATRIOT was a bigger vessel, Ex. B at 91:16-18, 22-24., and thus more suitable for the task at hand. Cabras did not insist that PMT use the *CAJUN* nor in any way influence PMT's choice of the CAJUN for the work PMT had contracted to do. Ex. B at 91:25, 92:1-4. Ken Collard, PMT President, personally negotiated for the hire of the *CAJUN* and personally made the decision to utilize the *CAJUN*. Ex. B at 79:4-16.[2] Except for the *Cajun* itself, PMT "owned all the equipment necessary for the underwater mission of the cleaning of the hull." Ex. B at 21:19-21.

PMT President Mr. Collard testified in great detail regarding PMT's dive operations and the particular equipment involved and that he personally turned off the wrong air supply valve. *See* Ex. B generally.[3] During dive operations, a diver's air is supplied by a color-coded "umbilical cord" comprised of an air hose and an underwater radio communications line. Since more than one umbilical cord is in use at any given time,[4] the umbilicals are color-coded white and black and are matched to a corresponding white or black divers "hat" or mask. The umbilicals are hooked up to a supply "volume tank" which is supplied air by PMT's main air compressor. Ex. B at 13:6-25. The supply valves on the volume tank, referred to as "quarter-turn" valves, likewise are color coded white-black. Ex. B at 47:6-48:3. The set-up is then white quarter-turn valve, white umbilical cord, white diver's mask, and the same for color black. However, on the day of the incident, PMT made a mistake. Instead of white quarter-turn valve

---

[2] PMT made the decision to continue the dive cleaning operations even in spite of feeling "cramped" on the work deck of the *CAJUN*. Ex. B at 81:24 - 82:2, 89:16 - 90:8, 91:22 - 92:3. PMT was aware of the size capacity of the *Cajun* **before** it hired the boat and thus **before** commencement of diving operations. Ex. B at 91:3-7. PMT also never told Cabras that it felt cramped on the *CAJUN*. Ex. B at 88:17-20.

[3] Though throughout this motion there are citations to particular pages in Mr. Collard's deposition transcript (Ex. B), the entire transcript is provided in that the overall content is pertinent to the issue raised in this motion and will assit the Court in deciding the motion.

[4] Even if only one diver is in the water, a stand-by or safety back-up diver is at the ready with a full compliment of gear, including an umbilical cord.

to white umbilical to white mask, the white umbilical was mistakenly hooked up to the black mask, and vice-versa for the black valve and black umbilical which were hooked up to the white mask. In other words, Barrineau's mask and umbilical were mis-matched. Ex. B at 14:1-20.[5] Likewise for the stand-by diver, whose mask and umbilical cord were mis-matched. *See* Ex. C at 14:23 - 15:11.

PMT's dive operations were under the command of PMT's Dive Superintendent Carey Rose, who, as the undisputed record shows, had the sole and ultimate responsibility of controlling the air compressor and the regulator regulating the pressure into the volume tank, as well as the volume tank itself. Ex. B at 9:10-25, 10:1-6, 28:1-25, 29:20-25. Unaware that the masks and umbilicals were mismatched, Mr. Collard turned off Barrineau's air supply by turning off the valve he believed to be supplying air to the stand-by mask. Ex. A, Response to Interrogatory No. 5; Ex. B at 8:5-9, 16:6-14, 30:6-24; Ex. C at 16:15-19.[6] Responsibility for

---

[5] It is uncertain which color of umbilical was connected to Barrineau. Said another way, the record does not reveal whether Barrineau was wearing a black mask or a white one, nor does Mr. Barrineau himself recall, but the absence of this fact is irrelevant because the incident occurred when air to Barrineau's mask was shut off when the intention was to shut off the air supply to the stand-by diver's mask. PMT President Ken Collard intended to shut off the air supply to the stand-by mask (the stand-by diver was still on board not in the water) because the regulator on that mask needed to be repaired or replaced. Under ordinary circumstances, the stand-by regulator would prevent air from flowing to and through the mask unless the stand-by diver sucked on the regular - an "on demand regulator" - but in this instance the regulator was not functioning properly and air was flowing through it unabated. Mr. Collard intended to shut of the air to the stand-by mask in order to repair or replace its regulator. In doing so he mistakenly turned off the air to Barrineau's mask because the colors were mis-matched. See Ex. B at 16:6-17:25.

[6] Ken Collard explained the accident as follows:

> A    The mask that was not in use, as it was being hooked up to the second diver began -- the regulator began to free-flow, meaning the air would not stop dispersing out of it. A regulator, if you are familiar with what a regulator does, it is -- a demand regulator that when you breathe in, it's supposed to provide air.
> This regulator was malfunctioning and it would not stop free flowing of air. So, we had to disconnect the air supply line in order to disconnect the regulator and replace it with a new one.
> At that time, the umbilical that was not being used by Mr. Barrineau, the cord turn valve that supplies that hat was inadvertently turned off because the hat was mistakenly hooked-up to the wrong umbilical.
> Again, without remembering exactly which hat was -- Mr. Barrineau had, he either had the black hat hooked-up to the white umbilical or he had the white hat hooked up with

correctly matching the white umbilical to the white mask and the black umbilical to the black mask rested solely with PMT. Ex. B at 18:1-13. Coming at it from the other way, PMT has admitted that Cabras Marine employees on board the *CAJUN* had nothing to do with ensuring that the umbilicals and masks were properly matched. Ex. B: 18-24-25; 19:1. In fact, once the boat arrived at the dive site and was tied off by the Cabras crew, the crew waited in the wheelhouse of the *CAJUN*, Ex. B at 19:2-12, and were not expected to be involved at all in the dive operations. Ex. B at 19:13-17. Indeed, PMT's instructions ***were that only PMT personnel were permitted on the work deck when the dive operations were taking place.*** Ex. B at 81:7-23. Moreover, PMT had the responsibility to maintain all of its own equipment, and a PMT employee was designated on a one-to-one basis to monitor each item of its machinery and equipment and ensure that the machinery and equipment, including the air compressor and the air volume tank, were in good working order. Ex. B at 26:13 - 27:11, 27:23 - 28:4, 28:17-18, 28:24 - 29:1, 41:4-15. It is undisputed that PMT's equipment, including the way the valving on the equipment was set, functioned properly. Ex. B at 37:24 - 38:6. According to Mr. Collard, "[t]here was nothing mechanically unsatisfactory with the working conditions of the any of the equipment," and "[b]esides the malfunctioning of the regulator,[7] there was nothing defective of any of Pro Marine's equipment." Ex. B at 38:2-4, 21-23 (footnote added). The equipment worked as expected, however, as Mr. Collard stated, the "problem laid up in the connection of . .

---

    the black umbilical.
           The air was cut off, was shut off and this is when we realized that we have shut the -- the mistake was made.
        Q     Instead of shutting off the air to the unused mask --
        A     Yes.
        Q     -- the air to Mr. Barrineau --
        A     Yes.

Ex. B at 16:15 - 17:1-25; *see also* Ex. B at 30:6-24.

[7] The functioning of the regulator is only an issue in this case insofar as its leaking precipitated the shutting off of the wrong quarter-turn valve.

the masks to the umbilical hoses." Ex. B at 38:4-6. No one from PMT, including Rose, believed or said anything was wrong with the equipment. Ex. B at 18-21.

It is undisputed that neither of the two Cabras employees on board the vessel had anything to do with hooking up or matching the umbilicals and masks. Ex. B at 14:22 - 15:5, 18:24 - 19:2, 22:6-11. The Cabras employees never even touched PMT's equipment, nor were they permitted in the work area during dive operations. Ex. B at 42:10-19; 81:11-13. In fact, PMT had no expectation that the Cabras employees would be involved in the diving operation, or in any rescue operations. Ex. B at 19:9-17, 22:14-15, 35:18-22, 36:3-9, 43:21 - 44:3. PMT also had no expectation that Cabras would have any obligation to ensure that the PMT employees were medically fit and trained to do carry out their mission, or that their equipment was set up properly. Ex. B at 36:25 - 37:6, 75:18 - 76:9. On each of the four and a half days[8] in which Cabras transported PMT to the Hauge to conduct the dive cleaning operations, Cabras had no role or responsibility other than shuttling PMT between the dock and the Hauge, and securing the *Cajun* to the Hauge so that PMT could carry out its diving operations. Ex. B at 22:14-15, 22:24 - 23:15, 24:21- 25:11, 32:13-19, 36:10-21. Cabras also had no role once the *Cajun* arrived back at the dock on the day of the incident. Ex. B at 47:2-5.

During this lawsuit, PMT has admitted negligence and causation:

> ***that the cause of the accident involved in this litigation was the conduct of an employee of Pro Marine in negligently turning off the air supply to Mr. Barrineau*** while he was involved in a dive. Pro Marine has never alleged that the accident was the fault of Cabras Marine. Cabras' sole involvement was the provision of a vessel to transport Pro Marine's crew and equipment to and from the project site.

---

[8] It is important to note that though the project took 4.5 days, Mr. Barrineau's injury occurred on day #2 just a few minutes after the work commenced. Day # 2 was then aborted. Day #1 of the project had seen no diving but had rather been a day of mobilzation and mapping out the underwater work

*See* Aff. of Thomas C. Sterling in Support of Mot. for Approval of Good Faith Settlement, ¶ 2 (emphases added).

B. Procedural Facts

Barrineau alleges five counts against Cabras: unseaworthiness, maintenance and cure, negligence, negligence per se, and negligence res ipsa loquitur.

PMT has settled the claims asserted against it by Plaintiff, and on December 21, 2006, the Court granted PMT's Motion for Summary Judgment on the cross-claim asserted by Cabras. The only claims remaining in this lawsuit, therefore, are those asserted by Plaintiff against Cabras.

III. LEGAL ANALYSIS AND ARGUMENT

A. Standard for Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Here, there is no genuine issue as to any **material** fact and Cabras is entitled to judgment as a matter of law.

B. Cabras is Not Liable for Unseaworthiness.

The test for a seaworthy vessel is whether the vessel, crew, and appurtenances and operation are reasonably fit for the vessel's intended purpose. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960). The standard is not absolute perfection, but rather reasonable fitness for her intended service. *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944). Here, there is no allegation or dispute that the vessel owner did not maintain the *CAJUN* in a condition reasonably fit for its intended mission, that is, transporting PMT employees from the dock to the dive site and back.

Unseaworthiness is a condition of the vessel that arises from defective gear, appurtenances in disrepair, or an unfit or improperly manned crew. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 1971 AMC 277, 281. On the other hand, "isolated, personal negligent acts" of a co-worker do not render a vessel unseaworthy. *Id.* In *Usner* a longshoreman was injured when he was struck by the ship's boom, an incident that had not happened before. *Id.* at 278. The Supreme Court held that one's personal negligent act does not render the vessel unseaworthy. *Id.* at 282. *See also Mitola v. Johns Hopkins Univ. Applied Physics Lab.*, 839 F. Supp. 351, 358 (D. Md. 1993) ("a single negligent act committed by an otherwise competent crew member cannot render a ship unworthy"). Unlike an isolated act, a negligent act must be "pervasive" and repeated frequently for it to constitute an unseaworthy condition. *Daughdrill v. Ocean Drilling & Exploration Co.*, 709 F. Supp. 710 (E.D. La. 1989).

By Plaintiff's own admission, his injuries were not caused by a *condition* of the vessel, but rather Mr. Collard's "intentionally turning off an air supply valve which directly controlled Plaintiff's own source of air while he was under water." Ex. A, Response to Interrogatory No. 5. While *Usner* and *Mitola* distinguish between unseaworthy conditions and negligent acts, the fact that Mr. Collard has committed an intentional act signifies that his conduct does not render the entire vessel unseaworthy. Mr. Collard's act was isolated; there is no evidence that the same act has been committed by any other PMT employee, and certainly by no Cabras employees, whom, as earlier noted, had no role in the dive operations except to transport the *Cajun* to the Hauge and back to the dock and were not permitted in the work area. The lack of pervasiveness of the switching of the valves or the turning off of air supply demonstrates that it was not a condition of the vessel, and certainly not a condition created or controlled by Cabras. Indeed, Plaintiff has emphatically stated the precise cause of the accident as follows: ***"What difference does it make which color coded umbilical was put on what hat ?! All one has to do is follow the hose into***

*the water and figure it out."* Ex. C, Ex. A, (written accident report/statement of Mr. Barrineau) (emphases added). When given the opportunity to expand on his written statement during deposition, Mr. Barrineau testified as follows:

> A: If there are two umbilicals, one is in the water, one is on the deck of a fairly small vessel, before any valves are shut- off, any valves that especially might not be marked, follow the umbilicals on the deck first from the valve. And, the one that goes from the valve inside the water will probably have the diver on the other end of it. The one that's on the deck of the boat with the hat is probably the one that's there no diver, so.
>
> [....]
>
> Q: Okay. And your answer to my previous question when you said, all one would have to do is follow the umbilical that goes to the man in the water, and follow the one that goes to the dive suit or equipment that's on the deck, then one would know not to shut-off the valve that controls the hose going into the water.
>
> A: Correct

Ex. C at 14:1-10, 23-25, 15:1-11. There is no genuine dispute over the fact that PMT had the sole and ultimate responsibility to ensure that the valve leading to the diver, Mr. Barrineau, was not shut-off.

Moreover, the equipment used by PMT was not defective, in that it operated properly and as expected. The incident is solely attributable to Mr. Collard mistakenly turning off the valve connected to Barrineau's air supply when he intended to shut-off the air supply to the free-flowing regulator for the stand-by diver. Had Mr. Collard not made this mistake, nothing would have happened to Mr. Barrineau. Likewise beyond dispute is that Mr. Collard was PMT's President and not a Cabras employee. Cabras had absolutely no control over PMT's personnel or equipment, and therefore did not create any unseaworthy condition by asserting indirect or direct control over PMT's own dive operations and its divers. To the contrary, recall that only PMT employees were permitted on the work deck of the *Cajun* where the dive operations were being

conducted.

The undisputed evidence shows that the *Cajun* was entirely seaworthy. The boat worked as intended, that is, transporting PMT to and from the dock and the Hauge. There was nothing pervasively defective about Cabras' role in the operations and nothing pervasively defective about the *Cajun*. On the other hand, the record is replete with admissions by PMT and Mr. Barrineau that PMT's negligence in "not following the hose connected to the diver" before shutting off any valve was the sole cause of Barrineau's injuries, and that Cabras had no role in causing those injuries. Summary judgment on the claim of unseaworthiness is therefore proper.

### C.   Maintenance and Cure

The right to maintenance and cure arises out of the employment relationship. In determining who is the employer with respect to liability for maintenance and cure, the same criteria apply as those applicable in determining liability under the Jones Act. *Fink v. Shephard S.S. Co.*, 337 U.S. 810 (1948). Under the Jones Act, if there is no employment relationship between the owner of the vessel and the plaintiff, the owner has no maintenance and cure liability. *Callan v. Cope*, 165 F.2d 703, 704 (9th Cir. 1948). Courts uphold this standard even if the owner has a share in the profits from the particular voyage, *id.*, oiled the vessel's engine, *id.*, or paid for the vessel's fuel and all maintenance and repairs, *Solet v. M/V Capt. H. V. Dufrene*, 303 F. Supp. 980, 982, 987-88 (E.D. La. 1969).

There is no dispute that PMT employed Barrineau, and that Barrineau was never employed by Cabras. *See* Ex. D, Response to Interrogatory No. 2. Accordingly, only PMT--and not Cabras--has liability to pay for Barrineau's maintenance and cure, assuming any is due to Mr. Barrineau in the first place.

### D.   Cabras is Not Liable for Negligence.

In admiralty cases, to prevail on a negligence action, a plaintiff must demonstrate that a

defendant's act or omission played a substantial part in bringing about an injury.[9] *Benefiel v. Exxon Corp.*, 959 F.2d 805 (9th Cir. 1992); *American River Transportation Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998). In other words, a defendant's act cannot be a substantial factor if the plaintiff's harm would have occurred without it. Also, a plaintiff must demonstrate proximate causation, by showing that the injury or damage is a reasonably probable consequence of the defendant's act or omission.

There is no evidence to show that Cabras played any part, let alone a substantial part, in bringing about Barrineau's injuries. Instead, the evidence unequivocally shows that Cabras had absolutely no role in handling PMT's equipment, monitoring or utilizing the air supply valves or which diver was hooked up to which umbilical, closing the air supply valves or directing Barrineau or any other PMT employee how to their job. Cabras' sole responsibility was to provide the vessel and to transport PMT to the Hauge so that it could carry out its dive cleaning operations. Cabras' employees were nowhere near the incident and nowhere near the air supply equipment when the incident occurred. Cabras therefore did not have any part, let alone a substantial part in bringing about Barrineau's injuries. Moreover, as already noted, both PMT and Barrineau acknowledge that the sole cause of the incident was PMT's failure to "follow the hose" and figure out which hose had a diver on the end of it before turning off any air supply valve.

Because Barrineau cannot prove the essential element of causation for his claim of negligence, this claim of negligence must fail.

E.    <u>Cabras is Not Liable for Negligence Per Se</u>.

In support of his negligence per se claim, Barrineau claims that Cabras has violated U.S.

---

[9] Because it is undisputed that Mr. Barrineau was an employee of PMT not Cabras it is likewise beyond dispute that no Jones Act cause of action can be maintained against Cabras. It follows that the liberal causation standard under the Jones Act, defined as negligence which plays even the slightest part in causing the harm, is not applicable here. Rather, the standard is "substantial cause."

Navy Diving Manual 6-8.3, 6-12, and 8-7.2.1. The U.S. Navy Diving Manual, as its name indicates, however, is not a rule, regulation, code or statute. Rather it is a "general guide for planning diving operations." *See U.S. Navy Diving Manual, available at* http://www.coralspringsscuba.com/miscellaneous/usn_manual.htm. In other words, as a guide, it does not have the force of law. The claim itself is desperate and *per se* absurd because Cabras was not conducting any diving operations or supplying even one piece of dive equipment for the operation. Also, PMT did not in any event consider itself bound by the manual. *See* Ex. B at 52:18-19. Barrineau understandably has not pointed to a single rule, regulation, code or statute that Cabras has violated or for that matter which even applies to Cabras. Summary judgment in favor of Cabras is therefore appropriate on this claim.

    F.    <u>Cabras is Not Liable for Negligence Res Ipsa Loquitur.</u>

To invoke the doctrine of res ipsa loquitur, the following three elements must be established: (1) an injury-producing event of a kind that ordinarily does not occur in the absence of someone's negligence; (2) the event is caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the event must not have been due to any voluntary action or contribution on the part of the plaintiff. *Reber v. U.S.*, 951 F.2d 961, 964 n.1 (9th Cir. 1991).

Here, Plaintiff cannot rely on negligence / res ipsa loquitur because he is unable to establish even one of the elements. The undisputed facts demonstrate that Mr. Collard's actions and the air supply equipment were not within the exclusive control (or any control) of Cabras. Mr. Collard, who turned off Barrineau's air supply, was not a Cabras employee but rather President of PMT. PMT - and only PMT - determined how the dive operations would be conducted. PMT - and only PMT - set up the diving equipment. PMT - and only PMT - turned off Barrineau's air supply. PMT - and only PMT - was obligated to make sure the air supply

hose that was turned off did not have a diver attached to the end of it.

Cabras, on the other hand, had no control (or right of control) over PMT's equipment, and did not even touch PMT's equipment. Cabras did not direct Barrineau or PMT on how to conduct its dive operations. During the dive operations, Cabras' employees were to remain out of the work/diving area, per PMT's instructions. Ex. B at 42:10-19, 81:11-13. The undisputed record shows that Cabras had absolutely no control, let alone exclusive control, over PMT's activities.

Without any genuine evidence of fact that Cabras exercised exclusive control over the dive operations, Barrineau's res ipsa loquitur claim must fail.

## IV.  CONCLUSION

Barrineau has settled his claims with the party that acknowledges sole responsibility for his injuries, PMT. Barrineau's claims of unseaworthiness, maintenance and cure, negligence, negligence per se, and negligence under the doctrine of res ipsa loquitur are unsustainable in light of the undisputed facts that Barrineau's injuries were solely attributable to the actions of his employer, PMT. Summary judgment in favor of Cabras is therefore appropriate on all claims.

DATED: Hagåtña, Guam, April 5, 2007.

CARLSMITH BALL LLP

_____
DAVID LEDGER
Attorneys for Defendant
Cabras Marine Corporation

## DECLARATION OF DAVID LEDGER

I, DAVID LEDGER, declare under penalty of perjury that the following statements are true and correct:

1. I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2. I would testify competently as to these facts if called by the Court.

3. I am licensed to practice law before all courts in the Commonwealth of the Northern Mariana Islands and am admitted to this Court.

4. I am an attorney for Defendant Cabras Marine Corporation.

5. Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Responses to Defendant Pro Marine Technology's First Set of Interrogatories Propounded to Plaintiff.

6. Attached hereto as Exhibit B is a true and correct copy of the transcript of the deposition of Kenneth Collard.

7. Attached hereto as Exhibit C is a true and correct copy of pertinent pages of the transcript of the deposition of John Barrineau.

8. Attached hereto as Exhibit D is a true and correct copy of Plaintiff's Responses to Defendant Cabras Marine Corporation's First Request for Answers to Interrogatories to Plaintiff.

I declare under penalty of perjury that the foregoing is true, correct and complete.

Executed this 5th day of April, 2007 at Hagåtña, Guam.

_____
DAVID LEDGER

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 5th day of April 2007, I will cause to be served, via electronic filing/service, a true and correct copy of **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT THEREOF; DECLARATION OF DAVID LEDGER; EXHIBITS A-D; CERTIFICATE OF SERVICE** upon the following Counsels of record:

William M. Fitzgerald, Esq.
Law Office of William M. Fitzgerald
1st Floor, Macaranas Building
Post Office Box 909
Saipan, MP 96950

Bruce Berline, Esq.
Law Office of Bruce Berline
1st Floor, Macaranas Building
Post Office Box 5682 CHRB
Garapan, Saipan MP 96950

DATED: April 5, 2007.

_____
DAVID LEDGER