1  was the -- let's break that down.  What was the

2  -- how long did the entire job take --

3       A    Four days.

4       Q    -- for you to finish it?

5       A    Yeah, we started on, I think May 21st

6  and finished on May 25th.

7       Q    Okay.    So,    the    entire    job    was    four

8  days?

9       A    Well -- (pauses).  Yeah, four days.

10      Q    Okay.

11      A    Five days.

12      Q    Five days.  Five days.

13      A    Five days.

14      Q    You know, I don't mean to make this an

15  exhibit we can't -- but this might refresh your

16  memory.   I think this is, this looks to be the

17  invoice that Cabras Marine has given you.

18      A    Yes, that's --

19      Q    Okay.  And I think we have dates here,

20  5/21.

21      A    That's correct.

22      Q    Okay; okay.  Does that help?  Does that

23  refresh your memory as to when --

24      A    Yes.

25      Q    Okay.    Okay.    Now,    you    loaded    this,

1  your PMT's equipment on board the Cajun.  Did

2  you use a crane to do so?

3      A   Yes, we had Cabras -- they had a, what

4  they call a cherry-picker.  It's a small crane.

5      Q   Okay.

6      A   At pier, F6.

7      Q   Okay.

8      A   And that's what we used, because we

9  were supposed to load everything over at Sumay,

10  where everything is fairly level, maybe a foot

11  or so difference, depending on the tides.  But

12  since they couldn't get over there, we had to

13  move our equipment over to F6, which there is a

14  substantial drop off from the top of the pier

15  down to the deck of Hague.  It became a safety

16  issue, so we asked them if we could borrow or

17  rent their cherry picker that they had there --

18      A   Okay.

19      Q   -- for us to be able to move our

20  equipment form our vehicles down on to the

21  deck.

22      Q   Uh-huh.  And who operated the crane?

23      A   It was one of the Cabras crew members.

24      Q   Do you know the name of that person?

25      A   No, I do not.

1    Q    Okay.  And again, once that equipment

2    was loaded, it stayed on the Cajun until the

3    job was done?

4    A    Correct.

5    Q    Okay.  And when it was loaded, did it

6    just sit on the deck of the Cajun or was it

7    tied down somehow?

8    A    We had the equipment lash so that it

9    wouldn't shift during the times when the Cajun

10   was moving, but there was nothing that was

11   permanently secured to the deck.

12   Q    Okay.  I want to hand you and we'll

13   mark this Exhibit C.

14        MR. BERLINE:  David, I had -- I thought

15   I had a --

16        MR. LEDGER:  This?

17        MR. BERLINE:  Yeah.  I might not have

18   got one -- oh, here.

19        (Defendant's Exhibit C was marked for

20   identification)

21   BY MR. BERLINE:

22   Q    Do you recognize that?

23   A    Yes.

24   Q    Can you describe that document for me?

25   A    It would be our check off list for

1  equipment that was supposed to have been

2  brought at on.  And then again we would make

3  sure that we got at all the equipment back up

4  off by another one, another list like this to -

5  - when we off loaded everything.

6      Q  Okay.  Do you know, did all these

7  equipment get placed on board the Cajun?

8      A  To the best of my knowledge, I would

9  say, yes.

10     Q  Could you just tell me what, under

11 Admin, there's a Neuro Exam Worksheet.

12     A  It's a neurological check off sheet for

13 a direction that the diver is, if he's

14 conscious, he's going through the pretty

15 extensive check list to determine if there's

16 any -- if he's got any problems, any injuries,

17 anything that requires followup, like say

18 chamber or the administering of oxygen, first

19 aid, things like that.

20     Q  Was that used?

21     A  That was myself and Mr. Mantanane

22     Q  Okay.  Above that is a PMT Safety

23 Emergency Plan.

24     A  Yes.

25     Q  Can you describe that for me?

1    A    That   is   our,   pretty   much   our   Safe

2  Practices Manual.

3    Q    Okay.   And that was on board?

4    A    Yes.

5    Q    Okay.   Do   you   have   a   copy   of   that   by

6  any chance?   Does it remain unchanged, it's a

7  booklet, or is it specific to each job?

8    A    It's pretty specific, job-specific, but

9  it   changes   on   a   fairly   regular   basis.    We

10  always   update   it.    And   this   was,   and   this

11  particular case was no exceptions.

12    Q    Okay.   Do   you   remember   anything   what

13  would   have   been,   what   that   would   have   said   if

14  we   were   reading   it   right   now?    Basically,   can

15  you   give   me   a   brief   description   of   what   would

16  be in that manual?

17    A    We   have   a   check   off   sheet   for   all   the

18  dive   operations,   again,   job-specific.    There

19  would   have   been   a   check   off   sheet   on   each

20  individual   day   which   again   the   --   it   was   --   was

21  supposed   to   have   been   followed.    Evidently   the

22  --   again,   the   mistake   in   the   hooking   up   of   the

23  hats was overlooked by all.

24    Q    Would   there   be   anything   in   there   such

25  as,   you   know,   make   sure   everybody   --

1   communication of an ongoing emergency to the

2   crew, any kind of procedures when there's an

3   actual dive emergency going --

4       A   Specify whose crew?

5       Q   Anybody on the boat. I'm asking you

6   who would -- (pauses). The first question

7   would be, does this manual dictate who needs to

8   be told when there's a diving emergency? Is

9   there a chain of command in there?

10      A   There is a chain of command, yes.

11      Q   Okay.

12      A   Everybody has their own individual

13  responsibilities.

14      Q   Okay.

15      A   Everybody is multitasks so that one

16  person just does one thing. You'll designate,

17  this will be -- you do something, you'll do

18  something, he'll do something. So everybody

19  knows the routines, and just like we did at

20  that day. The routine was followed and --

21  (pauses).

22      Q   Okay. But now, you had -- once you

23  turned that valve off, the quarter turn valve

24  on the volume tank and either Ben or Carey or

25  one of your employees had the mask and realized

1  the air is not stopping, would it be fair to

2  say that there was a sense of urgency there?

3      A   Yes.

4      Q   Okay.

5      A   It was Mr. Shelton who observed that

6  the air had not turned off.

7      Q   Okay.  And then the air was turned back

8  on I believe?

9      A   Immediately.

10     Q   And the harness was pulled up but --

11     A   No.

12     Q   -- it -- I'm sorry

13     A   I'm sorry.

14     Q   No, it's -- please, it's a question.

15  What happened next?

16     A   The harness was not -- the diver was

17  communicated -- or top side communicated with -

18  - I'm sorry, we call it top side.  The

19  supervisor, dive supervisor, communicated with

20  the Barrineau through the underwater cams and

21  no response was returned from Barrineau.  Then

22  the tender who was directed to give the diver

23  what they call, line pole signals, "Are you

24  okay 1" is "Are you okay".  If you do not get a

25  one back, you start slowly bringing in --

1    Q    Uh-huh.

2    A    If you don't feel any resistance, you

3    quicken the recovery of that.   During the same

4    time, the communication, the dive supervisor is

5    still trying to communicate though the cams

6    box.   There was no response given.

7    Q    Okay.   Were people yelling?   Was there

8    a lot of excitement on the ship?

9    A    I'm sure that there was, but that was a

10   very fairly calm excitement because everybody

11   was being directed on what tasks and what the

12   responsibilities were.

13        We had to deploy the standby diver,

14   which took on the standby hat and went on

15   following Mr. Barrineau's umbilical.   Plus

16   another diver was put on scuba to go down and

17   be able to relay back.

18        During the time that both divers were

19   underwater, we had communications with the one

20   on the umbilical.   And during that time, Mr.

21   Barrineau had already surfaced on the outboard

22   side of the vessel and was swimming around the

23   stern, back towards the Cajun.

24   Q    Okay.

25   A    And we -- oh --

1  Q Please go ahead.

2  A We recovered our diver since we saw Mr.

3 Barrineau at the stern coming forward to us

4 swimming on his own accord.  We sent standby

5 diver with the communications after we got him

6 back to the surface heading back aft to hook up

7 with the diver with Mr. Barrineau and then

8 report back if there was any injuries.  Because

9 it was a good, probably 300 feet to go from

10 when he came around the stern to where the

11 Cajun was positioned on the hull.

12  Q Okay.  And at the time where it was

13 realized that the quarter turn valve, it was

14 turned    off    actually    controlled   Brady

15 Barrineau's air, at that time, what were you

16 doing specifically?  What was your job?

17  A Once the quarter turn was turned back

18 on --

19  Q Uh-huh.

20  A -- and then we realized, everything was

21 relayed through the dive supervisor, "Diver are

22 you okay?  Diver are you okay?"  No response.

23 "Tender, give him line pole signals."

24  Q Uh-huh.

25  A Again, we're all within these seconds

1  of when these transpired. Tender came back,
2  said, " No response on line pole signals".
3  Dive supervisor told Tender to start pulling on
4  the umbilical. Tender came in, there's no
5  resistance on the dive umbilical. "Standby
6  diver get dressed, get in the water."
7      A   Okay.
8      Q   By the time the diver had gotten in the
9  water, they pulled up the harness without a
10 diver.
11     A   Okay.
12     Q   At that time, we had communications
13 with the standby diver heading over to the same
14 direction. When he got about, underneath that
15 what they call the turn of the ship, the scuba
16 diver and another emergency diver was deployed
17 and sent in to go after.
18     Q   Okay. So, you were with Carey B. Rose
19 for this time?
20     A   Yes.
21     Q   Okay. So, did you see what the captain
22 was doing or where he was?
23     A   It wasn't a consideration at that time.
24     Q   Okay. All right. So, did you speak to
25 him afterwards?

1       A    No, I did not.  Mr. Rose did.

2       Q    Okay.  All right.

3       A    I was attending to Mr. Barrineau.

4       Q    Okay.  So, you don't have any personal

5  knowledge  as  whether  the  captain  had  been

6  become aware of this or not?

7       A    No.

8       Q    At the time it happened?

9       A    No.

10      Q    Okay.  And you don't have any personal

11 knowledge  whether  or  not  the  captain's

12 assistant or deckhand had become aware of this

13 at the time the incident --

14      A    No, I did not.

15      Q    -- at the time accident; okay.  Now you

16 went to -- you had a safety meeting that night;

17 is that correct?

18      A    That's correct.

19      Q    Okay.  And the solution was what?  What

20 was  --  was  the  solution  to  put  physical

21 restrains on the valves?

22      A    No, you see, I was -- we thought, Mr.

23 Rose and myself thought it would be better if I

24 did not attend, which I did not.

25      Q    Why was that?

1    A    Just for the simple fact that, I think

2   people would have not stated personal opinions

3   on how everything transpired if I would have

4   been there.

5    Q    Makes sense.

6    A    Which we found was more beneficial.

7   Everybody was very everybody -- everybody

8   partook in the discussions and we had made the

9   determination that we're going to change our

10  safety plan by putting physical restrains and

11  marking, identifying the valves not to be

12  turned out since they were divers' air, supply

13  life support.

14   Q    Okay; okay.    And would that be the

15  actual language of "Do not turn off this valve,

16  diver supply of air"?

17   A    Yes.

18   Q    Okay.    And did you in fact -- if it was

19  -- I don't want to phrase this to make you

20  think that I'm implying you have to comply with

21  U.S. Navy Diving Manual but, were you in

22  compliance now with the U.S. -- (pauses).    Are

23  you in voluntary compliance with the U.S. --

24   A    To the letter of the --

25   Q    -- with the requirements of the U.S.

1    Navy Diving Manual?

2        A    Excuse me.

3        Q    It's okay.

4        A    To the letter of the U.S. Navy Diving

5    Manual, no, we're not nor do we have to be.

6    Again, our requirements only are to be in

7    compliance with the CFRs, the 29 and the 46.

8    The Navy Diving Manual is a good baseline to go

9    off of --

10       Q    Uh-huh.

11       A    -- and, yes, they have the tried and

12   trued requirements and safety precautions

13   already.

14            But, to the letter, getting back your

15   question, to the exact letter of what the Navy

16   Regulations state, no, we're not in identical

17   compliance to their -- to their satisfaction.

18   However, we have made it that, one, of these

19   quarter turn valves can not be accidentally

20   turned off and, two, yes they are tagged that

21   under no circumstance will they be turned off,

22   that they are divers' supply and to -- that the

23   diving supervisor is the only one who has

24   authority to turn these off.

25       Q    Okay.  And if that physical restraint

1   had been put on that valve, that would have

2   prevented you from turning off that quarter

3   turn valve, is that correct?

4       A   That's correct.

5       Q   Okay.   Now, you have mentioned the

6   CFRs, 29 and 46, what are those?   I know what

7   CFRs are, but those specific sections, do they

8   pertain to commercial diving?

9       A   Both, yes.   There are sections, there

10  are parts within those titles that deal with

11  commercial diving operations --

12      Q   Okay.

13      A   -- or contract diving operations?

14      Q   Are there any specific regulations

15  whether it be OSHA, U.S. Coast Guard, CFRs or

16  anything else that would regulate the operation

17  of either the -- your air supply setup,

18  inclusive of the air compressor, the flasks,

19  the volume tanks, and/or the quarter turn

20  valves, specifically regulating --

21      A   Specifically?

22      Q   Uh-huh.

23      A   The quarter turn valve, no.   Except for

24  that they are to have non-return valves.

25      Q   Uh-huh.

1  A    The  CFRs  require  air  certifications
2  annual.   I  believe  just  prior  to  the  incident,
3  I  think  they  did  away  with  that  the  air  supply
4  had   to   have   a   volume   tank   whether   the
5  compressor  had  to  be  in  compliance  with  the  air
6  purification  standards.

7  Q    Okay.    Is  there  any  regulation  that
8  requires  a  bail  out  bottle,  did  a  diver  use  a
9  bail  out  bottle?

10  A    Yes,  there  is.

11  Q    And  which  one  is  that?

12  A    I  would  think  that  would  be  on  the
13  Title  29.

14  Q    And  that  would  apply  to  your  --  would
15  that  have  applied  to  the  job  of  scrubbing  the
16  hull  of  the  Hague?   Would  that  have  been
17  applicable?

18  A    It  probably  would.   The  standard  says
19  that  if  you  do  not  have  a  direct  ascent  or  if
20  you  are  in  a,  what  they  call  a  penetration
21  dive,  meaning  in  an  enclosed  diving  area,  but  -
22  -  (pauses).  But,  to  answer  your  question,  it
23  may  have  been  applicable.

24  Q    Okay.   Okay.   Now,  your  company,  PMT,
25  went  --  PMT  went  and  hired  the  M/V  Cajun  for

1   this job through Cabras Marine, correct?

2       A   Correct.

3       Q   Okay.   And have you done any prior

4   business with them before?

5       A   Yes.   We've worked not only as a

6   client, but we've also provided our services to

7   them.

8       Q   Okay.   Okay.   And have you used them

9   before in like situations as respect to

10  cleaning the Hague, other projects similar to

11  what you were doing to the Hague?

12      A   No.

13      Q   No?   This was the first --

14      A   That was the first time.

15      Q   Okay.   Okay.   Was this the first time

16  that you loaded the compressor and the air

17  supply diving equipment onto the M/V Cajun?

18      A   Correct.

19      Q   Okay.   Was this the first time that you

20  -- that PMT loaded their diving equipment on

21  any of Cabras' vessels?

22      A   For a job?

23      Q   Yeah.

24      A   Yes.

25      Q   Okay.   You continued to do business

1   with Cabras?

2       A   Correct.

3       Q   Okay.   You   contracted   them   to   hire

4   boats?  Or --

5       A   No,   we've   provided   --   we   haven't

6   utilized their services as far as their vessels

7   go, but we have provided our services to them.

8       Q   Okay.  Now, prior to work on the Hague,

9   someone went and met with the chief engineer on

10  the Hague; is that correct?

11      A   Correct.

12      Q   Okay.  Who was that?

13      A   Myself.

14      Q   Okay.  Why did you do that?

15      A   Each time you work on a vessel, you go

16  through what they call a ship's tagout.   That

17  is, a tagout of all the ship's machinery that

18  could pose a potential hazard to any divers.

19  or instance, suctions.

20      Q   Uh-huh.

21      A   We tag out the propeller.   We tag out

22  the   rudder.   Even   though   these   pieces   of

23  equipment do not move very quickly, they still

24  are tagged out.  What they call the electro- --

25  the cathodic protection is tagged out.   These

1  are electrical apparatuses that the ship is

2  dependent upon. So, a ship's tagout is filled

3  out, signed, witnessed of the ship's tagging

4  out and then it goes in our records.

5      Q    Okay.    What about -- did you do the

6  same thing for, I mean, the Cajun is a vessel

7  too, right? Did that pose a risk to the divers

8  also?

9      A    No, we have to shut down.

10     Q    Okay.  Completely shut down?

11     A    Shut down.

12     Q    Did anybody meet with the captain

13 pre-dive to discuss procedures for that?

14     A    Every morning was -- once we were in

15 place and secured to the hull of the Hague, the

16 captain was told the shut everything -- we

17 would just tell him, "Make it cold."

18     Q    Okay.    Okay.    Did the captain or

19 anybody from the Cajun or Cabras Marine come

20 and inspect PMT's setup after it had loaded the

21 equipment aboard the Cajun?

22     A    The Cajun's captain, is that what you

23 were asking?

24     Q    Anyone.

25     A    From Cabras?

1    Q    Yes.

2    A    No, they did not nor were they expected

3    it to.

4    Q    Okay.    So, once this equipment was

5    loaded and lashed to the Cajun, the captain

6    didn't come in and ensure that it was properly

7    secure or didn't inspect it at all, to your

8    knowledge?

9    A    No, that was our responsibility.

10    Q    Okay.    (lengthy pause; peruses

11    documents) Let me just finish up here.

12        MR. BERLINE:    I think I'm done.    Mr.

13    Ledger?

14        MR. LEDGER:    Can I show you the invoice

15    that you reviewed a moment ago.

16        MR. BERLINE:    Sure.    Can -- this is my

17    own copy.    This --

18        MR. LEDGER:    Not the --

19        MR. BERLINE:    Oh, yes, yeah.

20        MR. LEDGER:    The invoice.

21        MR. BERLINE:    You want to go ahead and

22    make that?    I can make that -- I can --

23    (pauses).    I'm going to make that an exhibit,

24    but we need to make a copy of it.

25        MR. LEDGER:    Okay.

1    **RE-DIRECT EXAMINATION**

2    BY MR. LEDGER:

3    Q   "D", we are up to Exhibit D.  Okay.

4    (Defendant's Exhibit D was marked for

5    identification)

6    So, it was May 21st through the 25th,

7    2005 that the lawn services were rendered,

8    according to this.  Okay?  What day was Mr.

9    Barrineau's accident?  Do you remember?  Was it

10   the 22nd?

11   A   (pauses)

12   Q   Go ahead and check -- I mean, if you

13   need to refer to something.

14   A   Yeah, it was May 22nd.

15   Q   Okay.  So, the second day, second day

16   of operations.  So, in his -- Mr. Barrineau --

17   well, let me ask you.  The first day, May 21st,

18   was Mr. Barrineau one of the divers?  Or,

19   either a diver or attender on the operation?

20   A   The first day, we basically just got

21   the equipment on, loaded and situated.  We went

22   out and probably did the -- I don't believe, he

23   dove the first day because we had to go out

24   there and section off the hull for how we

25   progressed with the cleaning.

1      Q    Okay.    Then    the    second    day,    the    22nd,

2  that's    when    the    accident    happened    and    the

3  operation was aborted?

4      A    Correct.    He was the first diver in the

5  water.

6      Q    Okay.    And how far into the day were

7  you?

8      A    My    recollection    was    about    fifteen

9  minutes.

10      Q    Okay.    So,    Mr.    Barrineau's    time    on

11  board the Cajun would have been part of the day

12  on the 21st loading and stowing the equipment

13  and fifteen minutes or so on the second day,

14  the 22nd?

15      A    No.    We got into the dive operation

16  about fifteen minutes before.    Then he had to

17  come back up.    I mean, it was probably -- it

18  was probably a couple of hours that morning.

19      Q    That morning?

20      A    But it was less than half a day because

21  we aborted the -- (pauses).

22      Q    I got you.    Total time spent on the

23  boat that day, the second day, would have been

24  a couple of hours?

25      A    At the most.

1      Q    Okay.  And then -- so, on the 23rd, 24th
2  and 25th, Mr. Barrineau didn't work?

3      A    That's correct.

4      Q    Okay.  And was it you personally that
5  initiated contact with Mr. Stan Hall to see
6  about hiring the Cajun for this work?

7      A    Correct, yes.

8      Q    And was it you personally that then
9  went   to   Paul   Blas   to   continue   those
10 arrangements?

11     A    Yes.

12     Q    Okay.  Did you personally on behalf of
13 the PMT then make the decision to go ahead and
14 hire   the   Cajun   at   the   offer   great   for
15 $1,500.00?

16     A    Yes.

17     Q    Okay.  During that first day, the
18 equipment was loaded, lashed down and you went
19 on site to the Hague; is that right?  Or, do
20 you remember?

21     A    I    don't    remember    exactly.    My
22 recollection  is  that  we  would  go  out  and
23 section everything off.

24     Q    What was that?

25     A    We wouldn't actually start the cleaning

1  operation, because at that time we weren't --
2  we didn't know exactly where we going to be
3  stationed.

4          So, but my recollection is that we
5  loaded and staged and secured and got
6  everything running so everything was
7  operational. The first day, we may have gone
8  out there and done a preliminary section
9  determining the sections and then gone back.
10 And then the following day, we would have start
11 the actual cleaning. And, that's to the best
12 of my recollection without going back to time
13 sheets and -- (pauses).

14         Q    What does sectioning mean? What's does
15 that involve?

16         A    The Hague is about 800 feet long. Our
17 umbilicals are only 300 feet long. So, you can
18 only get a certain range of cleaning done with
19 the length of the umbilical you have. You have
20 to shift the Cajun to different locations on
21 the side of the hull so that you can reach all
22 of them.

23         Q    Okay. How do you do that? Is that in
24 the water operation or something that's done --

25         A    How'd you do what?

1      Q    How do you do the sectioning?  How do

2  you do what you just (pauses)?

3      A    Basically, one of -- the two divers

4  would go down.  The section is, it takes a

5  yellow crayon and just goes from the water line

6  straight down to the turn of the hull.

7      Q    Okay.  As far as the configuration of

8  the Cajun is concerned, I mean, were you

9  satisfied that the deck was adequate to do what

10  you needed to do?

11      A    Satisfied, as in and everything would

12  be -- (pauses).  We were cramped.  The space

13  that we had was cramped.  We didn't want any

14  other people out there that could jeopardize

15  operations.  So, there weren't anybody that was

16  really allowed on the stern that didn't have

17  anything directly associated with PMT's diving

18  operation.

19      Q    Okay.  That was per PMT's decision?

20      A    That was my decision, yes.

21      Q    Everybody else to stay out?

22      A    Any non-diving or non-PMT personnel

23  were asked not to come back there.

24      Q    Okay.  Despite the conditions that you

25  perceived as cramped, it was PMT's decision to

1  proceed off of the Cajun, is that correct?

2      A    That's correct.

3      Q    Okay.    This, I think were finished

4  with, Exhibit B. I'll get a copy for you.

5      A    Okay.

6      Q    All right, before you leave. For the

7  23rd, 24th and 25th, did you -- did PMT decide to

8  continue   to   utilize   the   arrangements   that

9  existed on the 21st and 22nd,   meaning the work

10 deck of the Cajun and all of the equipment that

11 was stored and lashed there?

12     A    The   same   equipment   was   used.    The

13 configuration of the equipment on the stern was

14 changed due to the fact that there was going to

15 be no more accidents or confusion as to the

16 equipment layout or hook up.

17     Q    Did the captain or the deckhand of the

18 Cajun direct or limit PMT's ability to arrange

19 its equipment the way it wanted it?

20     A    No.   If anything, they were helpful by

21 making   sure   all   of   their   equipment   and

22 materials was completely out of our way and

23 stowed below deck.

24     Q    Let's see (peruses documents).   Okay,

25 so Mr. Barrineau, he participated in the first

1    day, the mobilization process and perhaps the

2    sectioning and up until the time his accident

3    on the second day, and then from then on he was

4    not involved.

5        A    Correct.

6        Q    Is that correct?  Okay.  The cherry

7    picker that you used to load your equipment the

8    first day, was that located on F6 on the dock?

9        A    Yeah, it was in the vicinity of F6.

10       Q    Okay.  And did you make separate

11   arrangements with Cabras to utilize that?

12       A    I think it was the spur of the moment

13   thing.  Because, one, we had anticipated

14   loading off at Sumay.  It would have been a lot

15   easier for us.  What happened was it cost a lot

16   more time because then we had to go all the way

17   around over to F6 from where our warehouse is

18   on the Navy base.  And so it took us a lot more

19   time which, again, it -- like I say, we weren't

20   able to get a lot of cleaning done the first

21   day because of that mobilization.

22           So again, because of the safety issue

23   with loading our equipment from the pier side

24   down onto the stern of the Hague, we had to

25   utilize means of a crane service of some kind.

1    Q   So, was the cherry picker one of those

2  things that operates on land with rubber tires?

3    A   Right, that's correct.

4    Q   Okay.  Okay.  Then the procedures that

5  you described, once the sense of urgency   --

6  once it became known to your crew that the air

7  was cut off to Mr. Barrineau, and you described

8  this procedure where everyone had a job to do;

9  the tender had to pull on the umbilical, Carey

10  Rose was responsible for trying to communicate

11  over the voice cam, is that right?

12    A   That's correct.

13    Q   Okay.  And -- risk of repeating myself,

14  I mean, would you have wanted the Cabras

15  captain and deckhand to intervene in that

16  process?

17    A   No.

18    Q   You rather have them just stay where

19  they were and allow you to do what was, this

20  seemingly orchestrated response?

21    A   Correct.

22    Q   The response that you -- this procedure

23  that you described, tugging on the umbilical,

24  trying to communicate, getting a standby diver

25  ready, is that procedure part of this PMT

1  Safety Emergency Plan that's on Exhibit C?

2      A    Correct.

3      Q    Okay.    I  was  curious,  not  that  it

4  really  makes  much  different,  but  when  you  --

5  when Mr. Berline was asking you if all of these

6  items  were  loaded  on,  did  you  put  scooters  on

7  the Cajun?

8      A    Yes.    They're underwater scooters.

9      Q    They're  underwater  scooters?    All

10 right.  I wasn't sure.

11     A    When  you're  sectioning  off,  it's  a  lot

12 easier  on  a  diver,  you  don't  have  to  swim  800

13 feet  times  two,  actually  times  three,  because

14 you've got the --

15     Q    Not land scooters?

16     A    No.

17     Q    Okay.    I  saw  the  scooters,  battery

18 charger,  extra  battery,  I  was  thinking,  you

19 know,  like  --  what  do  you  call  those  things,

20 go-pads  or  something.    Okay.

21          Was  the  Hague  inside  the  breakwater,

22 inside  the  harbor?    You  know  what  I'm  talking

23 about  --

24     A    The  inner  harbor.

25     Q    The  inner  harbor.

1    A    Correct.

2    Q    Okay.    When    the    emergency    situation

3  arose,  who  was  sort  of  the  conductor  of  that

4  procedure  that  was  followed?

5    A    Myself and Mr. Rose.

6    Q    Okay.    Did    everyone    in    your    crew

7  perform  satisfactorily  --

8    A    That was --

9    Q    -- to  the  point  that  you  observed  them?

10 Were  you  pleased  with  the  way  they  responded?

11   A    Very.

12   Q    Okay.  And, I'm finished.

13        MR.  BERLINE:    I  just  got  a  couple  more.

14

15              **RE-CROSS EXAMINATION**

16 BY MR. BERLINE:

17   Q    Mr.  Collard,  do  you  think  the  safety

18 valves  --  I'm  sorry  the  quarter  turn  air  valves

19 on  the  volume  tank  are  safer  now  with  the

20 physical  restraints  than  they  were  without

21 them?

22   A    Yes.

23   Q    Okay.  Do  you  think  they're  safer  now

24 with  the  verbiage,  the  warning  that  is  on  them

25 now  than  they  were  before?

1     A    Yes.

2     Q    Okay.  Now, we have Cabras working a

3    crane to bring PMT's equipment onto the Cajun;

4    correct?

5     A    Correct.

6     Q    Okay.  We also have, correct me if I'm

7    mistaken, but the captain and his deckhand

8    moving their equipment, moving the Cajun's

9    equipment out of the way so PMT's equipment can

10   come on board; is that right?

11    A    My recollection is that they moved off

12   their mooring lines that they had on the deck.

13   Normally, they will screw their morning lines

14   in a zigzag fashion so that it runs off the

15   stern easier.  We needed that out of our way.

16    Q    Okay.  Did you communicate in any way

17   to the captain that, you know, space is tight

18   on this deck, we need as much space as

19   possible?

20    A    I may have.  That is a good -- I would

21   think so.

22    Q    You would think so?

23    A    We have a lot of equipment.

24    Q    You would inform the captain that you

25   needed as much space as possible?

1    A    Correct.

2    Q    Okay.  And did you inform the captain

3    or did you tell him that in your opinion you

4    thought that space was tight on the deck?

5    A    No, because we haven't ever had set

6    everything up yet.  There was nothing to really

7    gauge on how much room we're going to be

8    needing until we actually started the

9    operation, because everything was all

10   compartmentalized, everything came in bundles,

11   in boxes, and what we call fly away cases

12        So, until we got everything out and

13   positioned on the deck and started, you know,

14   hooking things up and utilizing did we find out

15   that we are going to be -- it was going to be

16   cramped.

17   Q    Okay.  At any time, was the captain

18   made aware or did he become aware that space

19   was tight, space was cramped on the deck?

20   A    I don't know if I ever expressed that.

21   Q    Okay.  Did he ever express it to you?

22   A    No, there was very little communication

23   except for when we told them -- once we got on

24   site and as I said make a call with very little

25   communication.

1    Q    Would it be apparent to a laymen --

2  let's back -- was it apparent to you that space

3  was pretty tight on that, on the deck?

4    A    Correct.

5    Q    Okay.  Would it have been apparent to a

6  layman, or somebody walking on the deck, you

7  know, it's pretty crowded.

8    A    I would agree with that, yes.

9    MR. BERLINE:    No further questions.

10  Okay.

11    MR. LEDGER:  When you --

12    MR. BERLINE:  I'm sorry.

13

14           **FURTHER RE-DIRECT EXAMINATION**

15  BY MR. LEDGER:

16    Q    When you unpacked your materials and

17  equipment to commence the diving operations and

18  you perceived tight working quarters, who

19  decided to proceed?

20    A    That would have been my determination.

21    Q    Okay.  Did you ever request Cabras to

22  provide you with a larger boat?

23    A    I think the discussion may have come

24  up, however there was nothing available because

25  the Cajun did come from Saipan just for this

1    job, because Cabras at that time didn't have

2    anything available to accommodate our needs.

3        Q    So, from the beginning of the job to

4    the end of the job, the 21st through the 25th,

5    the decision to utilize the Cajun for the

6    operation rested solely with PMT; is that

7    correct?

8        A    That would be correct.

9        Q    Okay.  Okay, great.

10        COURT REPORTER:  Are we done?

11        MR. LEDGER:  I think so.  We have four

12   exhibits --

13        MR. BERLINE:  Hold on.

14        MR. LEDGER:  Sorry.

15        MR. BERLINE:  I've got another followup

16   question.

17        MR. BERLINE:  Sorry.

18

19        **FURTHER RE-CROSS EXAMINATION**

20   BY MR. BERLINE:

21        Q    What were your original needs that you

22   communicated to Cabras?

23        A    A flat deck and toilet facilities, and

24   pier access that we can load and off load our

25   equipment.

1    Q    Okay.

2    A    Accessible pier access.

3    Q    Okay.  Did you discuss the size of the

4  ship?

5    A    We   knew   Cabras's,   what   they   had

6  available.   And again, like I just said, the

7  Cajun was the only thing that was available.

8    Q    Are   you   familiar   with   Cabras's

9  inventory of ships?

10    A    Local ones, the local inventory.

11    Q    Okay.  Did you have one in mind?

12    A    Yes, but it was already contracted out

13  to MSC.

14    Q    And which one was that?

15    A    I believe the Patriot.

16    Q    Is the Patriot bigger than the Cajun?

17    A    Yes.

18    Q    Okay.  Thank you

19

20         **FURTHER RE-DIRECT EXAMINATION**

21  BY MR. LEDGER:

22    Q    Well, whose decision was it to use the

23  Cajun for the operation?

24    A    Solely mine.

25    Q    Okay.  It wasn't forced on you.  You

1  had your choice to use it or not to use it; is
2  that correct?
3      A    That's correct.
4      Q    Okay.  Thank you.
5          MR. BERLINE:  That's it?
6          MR. LEDGER:  Yes.
7
8          (Deposition concluded at 3:40 p.m.)
9      **HAGATNA, GUAM, WEDNESDAY, FEBRUARY 21, 2007**
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF WITNESS

I, **Kenneth W. Collard, Jr.**, the deponent herein, do hereby certify that I have read, or had read to me, the foregoing typewritten pages 1 through 93 inclusive. My changes thereof, if any, have been noted on a separate sheet of paper, which I have signed, and which I understand will be appended to and made a part of this deposition. I certify that the same is now a true and correct transcript of my testimony.

_____

Kenneth Collard


Dated: _____

REPORTER'S CERTIFICATE

1

2

3    I, **George B. Castro**, Court Reporter, do

4 hereby certify the foregoing 92 pages to be a

5 true and correct transcript of the audio

6 recording made by a Notary Public Officer of

7 Depo Resources in the within-entitled and

8 numbered case at the time and place as set

9 forth herein.

10    I do hereby certify that prior to

11 examination the deponent was duly sworn upon

12 oath; that thereafter the transcript was

13 prepared by me or under my supervision.

14    I further certify that I am not a direct

15 relative, employee, attorney or counsel of any

16 of the parties, nor a direct relative or

17 employee of such attorney or counsel, and that

18 I am not directly or indirectly interested in

19 the matters in controversy.

20    In testimony whereof, I have hereunto set

21 my hand and seal of Court this 30th day of

22 March, 2007.

23

24

25                                 George B. Castro

```
1              CHANGES TO TRANSCRIPTION

2

3   By Deponent:

4   Kenneth W. Collard, Jr.

5   Page      Change                        Initial

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

# DEPOSITION EXHIBIT

# FILE OF

# KENNETH W. COLLARD, JR.

February 21, 2007

1   CARLSMITH BALL LLP

2   DAVID LEDGER (CNMI BAR NO. F0195)
    Carlsmith Ball LLP Building
3   Capitol Hill
    Post Office Box 5241
4   Saipan, MP 96950-5241
    Tel No. 670.322.3455
5
    Attorneys for Defendant
6   Cabras Marine Corporation

7

8                    UNITED STATES DISTRICT COURT

9                            FOR THE

10                  NORTHERN MARIANA ISLANDS

11  JOHN BRADY BARRINEAU,              CIVIL ACTION NO. CV05-0028

12              Plaintiff,

13       vs.                          **DEFENDANT CABRAS MARINE**
                                      **CORPORATION'S FIRST REQUEST**
14  PROMARINE TECHNOLOGY and          **FOR ANSWERS TO**
    CABRAS MARINE CORPORATION,        **INTERROGATORIES TO**
15                                    **DEFENDANT PROMARINE**
                Defendants.           **TECHNOLOGY; CERTIFICATE OF**
16                                    **SERVICE**

17  CABRAS MARINE CORPORATION,

18              Cross-Claim Plaintiff,

19       vs.                          R E C E I V E D
                                      HO 315PPO
20  PROMARINE TECHNOLOGY,             JAN 26 2006

21              Cross-Claim Defendant.    BLAIR STERLING JOHNSON
                                      MOODY MARTINEZ & LEON GUERRERO
22                                    A PROFESSIONAL CORPORATION

23  **TO:   CROSS CLAIM DEFENDANT PROMARINE TECHNOLOGY**
        **AND ITS ATTORNEY OF RECORD,**
24
        **Thomas C. Sterling, Esq.**
25      **Blair, Sterling, Johnson, Moody, Martinez & Leon Guerrero, P.C.**
        **Suite 1008, Pacific News Building**
26      **238 Archbishop Flores Suite**
        **Hagåtña, Guam 96910**
27

28      ATTN: DAVID
        BY  : JME
4815-9318-3232.1 052540-00009   DATE: Answers Due 02/27/06

**DEFENDANT'S EXHIBIT A**

ORIGINAL

Cabras Marine Corporation ("Cabras") hereby request that ProMarine Technology ("ProMarine") answer under oath, in accordance with Rule 33 of the Federal Rules of Civil Procedure, the following Interrogatories.

In answering the Interrogatories, ProMarine is required not only to furnish information available from its own personal knowledge and records, but also information that is available to his attorneys, investigators, agents, or anyone else acting on his behalf.

The Interrogatories shall be deemed continuing so as to require supplemental answers if ProMarine obtains or recalls further information between the time the answers are served and the time of trial. Answers shall be inserted in the spaces provided in the Interrogatories. If for any reason additional space is necessary in answering any Interrogatory, complete the answers on additional sheets indicating the number of the Interrogatory which is being answered.

## DEFINITIONS AND INSTRUCTIONS

1.      "Cabras" means Cabras Marine Corporation.

2.      "ProMarine" and "you" and "your" refer to Defendant and your Attorneys and agents.

3.      "Complaint" refers to the Complaint filed by Plaintiff in the District Court for the Northern Mariana Islands.

4.      "Claim" refers to any and all claims or allegations set forth in the Complaint.

5.      As used herein, the term "documents" means and includes any and all:

         a.      Tangible things or items, whether handwritten, typed, printed, tape recorded, electronically recorded, video-tape recorded, visually reproduced, stenographically reproduced or reproduced in any other manner;

         b.      Originals and all copies of any and all communications;

c.    Writings of any kind or type whatsoever;

d.    Data compilations gathered through detection devices from which information can be obtained or translated by the respondent, if necessary, into a reasonably usable form as defined in Rule 34 of the Federal Rules of Civil Procedure;

e.    Books and pamphlets;

f.    Microtape, microfilm, photographs, movies, records, recordings, tape recordings, and video-tape recordings, stenographically or otherwise reproduced;

g.    Diaries and appointment books;

h.    Cables, wires, memoranda, reports, notes, minutes and interoffice communications;

i.    Letters and correspondence;

j.    Drawings, blueprints, sketches, and charts;

k.    Patents and patent applications;

l.    Contracts or agreements;

m.    Other legal instruments or official documents;

n.    Deeds, leases, mortgages, assignments or other instrument relating to real property or personal property;

o.    Published material of any kind;

p.    Engineering or scientific notebooks and data;

q.    Financial statements, balance sheets, profit and loss statements, statements of financial condition, income tax returns, worksheets, reports, projections, schedules, ledgers, books, records, and journals;

1          r.      Vouchers, expense accounts, receipts, invoices, bills, orders,

2  billings, bank account records, and checks;

3          s.      Investigation or incident reports;

4          t.      Files and records;

5

6          u.      Proposals, feasibility studies, engineering studies, renderings,

7  plans, as-built drawings, progress schedules, change orders, estimates and projections;

8          v.      Notes or summaries of conferences, meetings, discussions,

9  interviews, or telephone conversations or messages;

10         w.      Travel reports, ticket stubs, and vouchers;

11         x.      Drafts or draft copies of any of the above.

12

13     6.     "Communication," as used herein, shall include all oral, written, visual or other

14  sensory means of transmitting information or statements.

15     7.     "Identify," when used with respect to any document, means to describe the

16  document in such a manner that all the following information is provided:

17         a.      Its nature (e.g., letter, memorandum, contract, report, statement,

18  recording, photograph, etc.);

19         b.      Its title, if any;

20         c.      The date the writing was prepared, drafted or recorded;

21

22         d.      The identity of the person or persons who prepared, drafted or

23  recorded the writing or participated therein;

24         e.      The date the writing was sent and received (if applicable) and the

25  identity of the person sending and the person receiving the writing;

26         f.      A summary or description of the contents of the writing; and

27

28

g.    The identity of the person who presently has custody or control of the writing.

8.    "Identify" when used with respect to a person or entity shall mean, with respect to a person, to state the person's name, residence address, residence telephone number, employment position, employer, business address, business telephone number, relationship to you, and (if known) date of birth; and with respect to an entity, to state the name of the entity, its business address, business telephone number, and to identify its partners, officers, and directors.

9.    "Identify" when used with respect to a lawsuit shall mean to state the nature of the lawsuit, the full names of all parties contained on the caption of the lawsuit, the civil or docket control number of the lawsuit, the jurisdiction in which the lawsuit was filed, and the outcome of the case.

10.    "Identify" when used with respect to a claim shall mean to state the name of the party against whom the claim was made, the date the claim was made, the date of the injury or damage claimed, the nature of the injury or damage claimed, and the disposition of the claim.

11.    "Identify," when used with respect to a communication, shall mean to state each of the following:  (1) the name and title of the person who made the communication; (2) the name and title of the person who received it; (3) the date of the communication; (4) the type of communication; and (5) a summary of the contents of the communication.

12.    If any of the Interrogatories cannot be answered in full, please answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

13.    If additional space is required for the answer to any Interrogatory, complete the answer on additional sheet(s) of paper bearing the same number as the number of the Interrogatory that is being answered.

14.    Please note that ProMarine, pursuant to Fed. R. Civ. P. 26(e), is under a continuing duty to seasonably supplement its responses with information that is obtained or became available subsequent to the preparation and filing of the responses.

15.    Each of these definitions and instructions is hereby incorporated into each of the Interrogatories to which it pertains.

## INTERROGATORIES

INTERROGATORY NO. 1: For each employee ProMarine had on board the M/V CAJUN at the time of the incident, provide the following information:

a.    full name

b.    date of birth

c.    social security number

d.    current residence address

e.    current employer

Answer:


INTERROGATORY NO. 2: For each employee ProMarine had on board the CAJUN at the time of the incident, provide the following information:

a.    description of job

b.    description of credentials or certificates held (for example, commercial diver certification)

Answer:


INTERROGATORY NO. 3: Identify each witness known to you who has any knowledge -- eye-witness or otherwise -- relating to the incident.

Answer:


INTERROGATORY NO. 4:  Omitted.


INTERROGATORY NO. 5: Describe and how or why the accident occurred.  For example, if air supply equipment malfunctioned or for some reason stopped working, describe such as best you can.

Answer:


INTERROGATORY NO. 6:  Regarding your Affirmative Defenses Nos. 2, 3 and 4, list all facts you have to support your allegations that Cabras Marine was negligent.

Answer:


INTERROGATORY NO. 7:          Omitted.

INTERROGATORY NO. 8:          Omitted.

INTERROGATORY NO. 9:          Omitted.

INTERROGATORY NO. 10:          Omitted.

Answer:

INTERROGATORY NO. 11:    With regard to paragraph 18 of Plaintiff's Complaint, was ProMarine the owner of "all of the equipment necessary to complete the underwater mission of scrubbing the hull of the M/V Hague, including the air supply used for Plaintiff Barrineau's dive."

Answer:


INTERROGATORY NO. 12:    With regard to paragraph 18 of Plaintiff's Complaint, was ProMarine responsible for maintaining and servicing "all of the equipment necessary to complete the underwater mission of scrubbing the hull of the M/V Hague, including the air supply used for Plaintiff Barrineau's dive"?

Answer:


INTERROGATORY NO. 13:    With regard to paragraph 18 of Plaintiff's Complaint, did ProMarine operate "all of the equipment necessary to complete the underwater mission of scrubbing the hull of the M/V Hague, including the air supply used for Plaintiff Barrineau's dive"?

Answer:


INTERROGATORY NO. 14:    With regard to paragraph 19 of Plaintiff's Complaint, did ProMarine own "the dive compressor aboard the M/V Cajun"?

Answer:

INTERROGATORY NO. 15:

a.    With regard to paragraph 19 of Plaintiff's Complaint, did an employee of Pro Marine operate "the dive compressor aboard the M/V Cajun"?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 16:

a.    With regard to paragraph 19 of Plaintiff's Complaint, did an employee of Pro Marine service or maintain "the dive compressor aboard the M/V Cajun?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 17:

a.    With regard to paragraph 21 of Plaintiff's Complaint, was an employee of Pro Marine responsible for maintaining "Plaintiff Barrineau's air supply" during the hull scrubbing?

b.    Identify the employee.

Answer:


INTERROGATORY NO. 18:        Omitted.

INTERROGATORY NO. 19:        Omitted.

INTERROGATORY NO. 20:        Omitted.

INTERROGATORY NO. 21:        Omitted.

INTERROGATORY NO. 22:    Has Plaintiff Barrineau applied for and been awarded workers compensation benefits as a result of the incident?

Answer:


INTERROGATORY NO. 23:    Omitted.

INTERROGATORY NO. 24:    Omitted.

INTERROGATORY NO. 25:    Omitted.

INTERROGATORY NO. 26:    Omitted.


INTERROGATORY NO. 27:    With regard to paragraph 63 of Plaintiff's Complaint, did ProMarine have "exclusive control of plaintiff's air supply and/or the controls for Plaintiff's air supply".

Answer:


INTERROGATORY NO. 28:    State the full name, complete address, and phone number for all doctors and health care providers, including psychologists and psychiatrists, who have treated or examined the Plaintiff at ProMarine's request.

Answer:


INTERROGATORY NO. 29:    Omitted.

INTERROGATORY NO. 30:    Omitted.

INTERROGATORY NO. 31:    Omitted.

INTERROGATORY NO. 32:    Omitted.

INTERROGATORY NO. 33:

a.      State the number of days of work Plaintiff missed as a result of the accident.

b.      State the amount of wages (and, if applicable, benefits) Plaintiff lost as a result of the accident.

c.      Is Plaintiff still employed by ProMarine, but on disability leave ?  or has the employment terminated?

d.      If the employment terminated, please state when.

Answer:


INTERROGATORY NO. 34:        Omitted.

INTERROGATORY NO. 35:        Omitted.


INTERROGATORY NO. 36        State the following information from your payroll records, or other reliable records:

Answer:

| Year | Plaintiff's Gross Income | Plaintiff's Net Income |
|------|--------------------------|------------------------|
| 2006 (to date) | | |
| 2005 | | |
| 2004 | | |
| 2003 | | |
| 2002 | | |
| 2001 | | |
| 2000 | | |


INTERROGATORY NO. 37        As a result of the injury, has ProMarine's insurance carrier paid out replacement wage or income payments, workers compensation benefits, maintenance and cure, disability payments, or any other like compensation or payments ?  If you

1  answer yes, state the name and address of the source of each payment, the amount of each

2  payment.

3      Answer:

4

5

6      INTERROGATORY NO. 38:     If ProMarine or its insurance carrier paid any

7  medical bills on behalf of Plaintiff, state the name of the person or health facility paid and the

8  amount paid to each.

9      Answer:

10

11      INTERROGATORY NO. 39:     Omitted.

12

13      INTERROGATORY NO. 40 :     Omitted.

14      INTERROGATORY NO. 41:     Omitted.

15

16      DATED: Hagåtña, Guam,  January 26, 2006.

17  CARLSMITH BALL LLP

18                                 DAVID LEDGER

19                                 Attorneys for Defendant
                                Cabras Marine Corporation

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 26th day of January 2006, I will cause to be served, via hand delivery, a true and correct copy of **DEFENDANT CABRAS MARINE CORPORATION'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANT PROMARINE TECHNOLOGY** upon the following Counsels of record:

> William M. Fitzgerald, Esq.
> Law Office of William M. Fitzgerald
> 1st Floor, Macaranas Building
> Post Office Box 909
> Saipan, MP 96950

> Bruce Berline, Esq.
> Law Office of Bruce Berline
> 1st Floor, Macaranas Building
> Post Office Box 5682 CHRB
> Garapan, Saipan MP 96950

and

> Thomas C. Sterling, Esq.
> Blair, Sterling, Johnson, Moody, Martinez & Leon
>   Guerrero, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Suite
> Hagåtña, Guam 96910

DATED: Hagåtña, Guam, January 26, 2006.

DAVID LEDGER

**THOMAS C. STERLING**
**BLAIR STERLING JOHNSON MOODY**
**MARTINEZ & LEON GUERRERO, P.C.**
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Telephone:  (671) 477-7857
Facsimile:  (671) 472-4290

**THOMAS E. CLIFFORD**
Attorney at Law
2nd Floor Alexander Building, San Jose
P.O. Box 506514
Saipan, MP  96950
Telephone: (670) 235-8846/7
Facsimile:  (670) 235-8848

*Attorneys for Defendant Pro Marine Technology*

## IN THE DISTRICT COURT FOR THE
## THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOHN BRADY BARRINEAU, | CIVIL ACTION NO. 05-0028 |
| Plaintiff, | |
| vs. | **DEFENDANT PRO MARINE** |
| | **TECHNOLOGY'S RESPONSES TO** |
| PRO MARINE TECHNOLOGY and | **CABRAS MARINE CORPORATION'S** |
| CABRAS MARINE CORPORATION, | **FIRST SET OF INTERROGATORIES** |
| Defendants. | |
| CABRAS MARINE CORPORATION, | |
| Cross-Claim Plaintiff, | |
| vs. | |
| PROMARINE TECHNOLOGY, | |
| Cross-Claim Defendant. | |

**TO DEFENDANT AND CROSS-CLAIM PLAINTIFF CABRAS MARINE**
**CORPORATION AND ITS ATTORNEYS OF RECORD:**

**COMES NOW** Defendant **PRO MARINE TECHNOLOGY** (hereinafter

"Pro Marine") and provides the following responses to **CABRAS**

RECEIVED
CARLSMITH BALL
DATE: 03-27-06     11:34 am M


DEFENDANT'S
EXHIBIT
13

1  **MARINE    CORPORATION'S**    (hereinafter    "Cabras    Marine")

2  Interrogatories served herein on January 26, 2006.

3  <center>**RESPONSES TO INTERROGATORIES**</center>

4  **INTERROGATORY NO. 1**    Please see Exhibit "A" attached hereto.

5
6  **INTERROGATORY NO. 2**    Please see Exhibit "A" attached hereto.

7  **INTERROGATORY NO. 3**    Please    see    individuals    identified    in

8  Exhibit "A" attached hereto.

9  **INTERROGATORY NO. 5**    During the dive operation, Pro Marine

10  was using the Intispiro AGA full-face diving mask system

11  with a color coding system.   There was a black AGA mask and

12
13  a white AGA mask.   In addition, there were two umbilical

14  hoses,    each    complete    with    a    retrieval    line    and    a

15  communications line.   One of the hoses is coded with black

16  banding for use with the black mask, the other hose has

17  white banding for use with the white mask.   Somehow, the

18
19  dive team had installed the white mask on the black hose

20  and vice-versa.   As such, when a problem occurred on the

21  white AGA mask that required the mask to be taken off-line,

22  Mr. Collard on the deck turned off the umbilical hose that

23  was coded with white banding, it actually turned off the

24
25  air supply to Mr. Barrineau who was diving with the black

26  mask.

<center>- 2 -</center>

**INTERROGATORY NO. 6**    Pro Marine's affirmative defenses based upon the alleged negligence of Cabras Marine are solely based upon the allegations made by the plaintiff in its complaint that Cabras Marine was negligent.    Pro Marine presently has no knowledge of any facts supporting the contention that Cabras Marine was negligent in connection with this accident.

**INTERROGATORY NO. 11**    Yes, except for the M/V Cajun.

**INTERROGATORY NO. 12**    Yes, except for the M/V Cajun.

**INTERROGATORY NO. 13**    Yes, except for the M/V Cajun.

**INTERROGATORY NO. 14**    Yes.

**INTERROGATORY NO. 15**

(a)  Yes.

(b)  The employees actually involved in the operation of the air supply system, which cannot properly be characterized as a dive compressor, were Ben Matanane, Carey Rose, and Ken Collard.

**INTERROGATORY NO. 16**    Objection.    Interrogatory No. 16 is vague and ambiguous due to the use of the undefined terms "service or maintain" and the utilization of the term "dive compressor" which does not adequately identify the actual system utilized by Pro Marine for providing an air supply

- 3 -

to its divers.   Without waiving said objection, Pro Marine responds as follows:   The system was being operated at the time of the incident by Pro Marine employees.   Please see response to Interrogatory No. 15.

**INTERROGATORY NO. 17**

(a)   Yes.

(b)   Carey Rose and Ken Collard.

**INTERROGATORY NO. 22**   Pro Marine is unaware as to whether Mr. Barrineau has applied for or been paid Worker's Compensation benefits.

**INTERROGATORY NO. 27**   Yes.

**INTERROGATORY NO. 28**   No doctors or other health care providers have treated Mr. Barrineau at Pro Marine's request.

**INTERROGATORY NO. 33**

(a)   None.

(b)   None.

(c)   Terminated.

(d)   June 2, 2002.

**INTERROGATORY NO. 36**   Mr. Barrineau had no income from Pro Marine for any years other than 2005.   His gross income for

- 4 -

1  the year 2005 was $13,128.13 and his net income for that

2  year was $11,873.83.

3  **INTERROGATORY NO. 37**    No, as far as Pro Marine knows.

4  **INTERROGATORY NO. 38**    Pro Marine has not paid any medical

5  bills on behalf of the plaintiff.    Pro Marine has no

6

7  knowledge as to whether its insurance carrier has paid any

8  such medical bills.

9

10

11                          **THOMAS E. CLIFFORD, CNMI BAR NO. F0210**
                           ATTORNEY AT LAW

12                          **BLAIR STERLING JOHNSON**
                            **MOODY MARTINEZ & LEON GUERRERO**
13                          A PROFESSIONAL CORPORATION
                           THOMAS C. STERLING
14

15

16  DATED: FEBRUARY __27__, 2006      BY: _____

17                                    THOMAS C. STERLING, CNMI BAR NO. F0127
                                      *Attorneys for Defendant Pro Marine Technology*
18

19  **ATTACHMENT: EXHIBIT "A"**

20

21  E62\73061-01
    G:\WORD97\OFFICE\WORDDOC\PLD\TCS\278-FMT'S RESPONSES TO CABRAS
22  MARINE'S 1ST REQ 4 ANSWERS RE BARRINEAU V FMT TECHNOLOGY.DOC

23

24

25

26

- 5 -

1                            **VERIFICATION**

2   **ISLAND OF GUAM**     )
                           ) ss.:

3   **CITY OF HAGÅTÑA**    )

4

5       I, **CHIE COLLARD**, being first duly sworn, do state that I

6 am the Secretary/Treasurer and Business Manager of **PRO**

7 **MARINE TECHNOLOGY**; that I have read the foregoing document

8 entitled **DEFENDANT PRO MARINE TECHNOLOGY'S RESPONSES TO CABRAS**

9

10 **MARINE CORPORATION'S FIRST SET OF INTERROGATORIES** and that the same

11 is true of my own knowledge, except as to those matters

12 which are stated on information and belief, and as to those

13 matters, I believe them to be true.

14

15

16 
                             **CHIE COLLARD**

17

18   **SUBSCRIBED AND SWORN** to before me this 24th day of

19 February, 2006, by **CHIE COLLARD**.

20

21 

22                          *NOTARY PUBLIC*

23

24               BARBARA M. Q. CRUZ
                NOTARY PUBLIC
           In and for Guam, U.S.A.

25        My Commission Expires: Apr. 22, 2009
     1006 Pacific News Building, 238 Archbishop
       F.C. Flores St., Hagatña, Guam 96910

26



- 6 -

1:54 PM
02/15/06

# PRO MARINE TECHNOLOGY
## Employee Contact List

| Employee | SS No. | Phone | DOB | Address | Job Description | Current Emp. | Certification |
|---|---|---|---|---|---|---|---|
| Barrineau, John B | 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 | 670.288.5760 | 11/22/1970 | PMB 953 Box 10001 Saipan, MP 96950 | diver/tender | | Commercial Diver |
| Eflin, Vance S | 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 | 828.0024 | 09/02/1958 | HCR Box 17112 Malojloj, GU 96917 | diver assist/tender | | |
| Jonah, Conald D | 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 | 689.1847 | 05/26/1966 | P.O. Box 11965 Apaca Ave. Hs. #151 Yigo, GU 96929 | diver assist/tender | TofTest Inc. | |
| Matanane, Benedict J. | 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 | 646.5533 | 11/21/1961 | 194 Gov. C. Camacho Rd. Tamuning, GU 96913 | tender | | |
| Rose, Carey B. | 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 | 727.7008 | 01/13/1959 | 183 Francisco Javiar St. #3 Hagatna, GU 96932 | dive supervisor | Pro Marine | US Navy Diver |
| Shelton, Christopher K. | 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 | 688.8189 | 06/09/1970 | 415A Pale Kerian St. Sinajana, GU 96911 | lead diver | | US Navy Diver |
| Collard, Kenneth W. | 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 | 789-7001 | 6/ 7/1953 | P.O. Box 11021, Tamuning, GU 96931 | President | Officer, Pro Marine | Commercial Diver |

EXHIBIT "A"

**M/V HAUGE, Jr.**
MAY 21 THRU 24, 2005

**DIVER'S AIR SYSTEM**
[  ]  MARINER H/P AIR COMPRESSOR
[  ]  H/P (FILL) WHIPS
[  ]  30 GAL. VOLUME TANK
[  ]  H/P-L/P AIR REGULATOR (GAUGE) X 2
[  ]  EXTRA FITTINGS FOR K-BOTTLE
[  ]  HOSE FROM GAUGE TO VOL. TANK
[  ]  O2 HOSE ADAPTER TO VOL. TANK
[  ]  3 - 200 cf AIR CYLINDERS
[  ]  2 - 250' LIGHTWEIGHT UMBILICALS
[  ]

**AGAS**
[  ]  TAN AGA
[  ]  BLACK AGA
[  ]  KC'S AGA KIT (SPARE AGA)
[  ]  AGA SPARES KIT x 2
[  ]  AGA COVER/BAG X 2
[  ]

**COMMUNICATIONS**
[  ]  AGA COMMS WHIPS X 2
[  ]  EXTRA COMMS WHIP
[  ]  EXTRA MICS
[  ]  LG. AMRON COMMS BOX
[  ]  SM. AMRON COMMS BOX w/ CHARGER
[  ]  EXTENSION CHORD X 2
[  ]  MULTI-OUTLET ADAPTER X 2
[  ]

**HYDRAULICS**
[  ]  TWIN HYD. POWER UNIT
[  ]  SINGLE HPU
[  ]  150' X 1" BLACK w/ RED STRIPE HOSE
[  ]  150' X 1" BLACK w/ BLUE STRIPE HOSE
[  ]  75' x 1" ORANGE HOSE
[  ]  HYDRAULIC OIL - 5 GAL. PAIL
[  ]  OIL SPILL KIT (STOCKED)
[  ]  LG. DOUBLE HULL CLEANER w/ 15" BRUSH SET
[  ]  LG. DOUBLE HULL CLEANER ACCESSORIES BUCKET
[  ]  SM. DOUBLE PROP CLEANER w/ 9" BRUSH SET
[  ]  SINGLE PROP CLEANER w/ 15" OR 12" BRUSH
[  ]  ACCESSORIES BUCKET FOR THE ABOVE 2 TOOLS
[  ]  FLOATS w/ CLIPS X 8
[  ]  EXTRA 15", 12" & 9" BRUSHES
[  ]

**SCUBA OUTFITS**
[  ]  80 cf AIR TANKS X 7
[  ]  BCD X 2 (1 IS KC's)
[  ]  REG SET X 3 (1 IS KC's)
[  ]  WEIGHT BELT X 3 (1 IS KC's)
[  ]  TANK GAUGE (TO CHECK PRESSURE)
[  ]  FLASH LIGHTS X 2
[  ]  WRITING SLATE X 2
[  ]

**SCOOTERS**
[  ]  SCOOTERS X 3 (w/ 12v BATTERIES)
[  ]  BATTERY CHARGERS X 2
[  ]  EXTRA 12v BATTERY
[  ]

**CAMERAS**
[  ]  NIKONOS V w/ STROBE
[  ]  EXTRA FILM & BATTERIES (FOR NIK V)
[  ]  DIGITAL CAMERA PKG (IN PELICAN CASE)
[  ]

**ADMIN., etc.**
[  ]  BLACK PELICAN BRIEFCASE
[  ]  GRAY PELICAN BOX
[  ]  SHIP TAG-OUT SHEETS (MIN. 5)
[  ]  DAILY TIME SHEETS (MIN. 5)
[  ]  DIVE SHEETS (MIN. 10)
[  ]  PMT SAFETY/EMERG. PLAN
[  ]  NEURO. EXAM WORKSHEET
[  ]  USN DIVE TABLES
[  ]  MARINER COMP. OPS MANUAL
[  ]  YELLOW LUMBER CRAYONS
[  ]  PENS
[  ]  STAPLER
[  ]  PAPER CLIPS
[  ]

**MISCELLANEOUS**
[  ]  DIVER HARNESS X 3
[  ]  DAN EMERG. O2 KIT
[  ]  GRAY FOLD-UP FLY-A-WAY BOX
[  ]  HAND TOOL BOX (STOCKED INVENTORY)
[  ]  FIRE EXTINGUISER X 2
[  ]  5 GAL. GAS CONTAINERS X 3
[  ]  6 GAL. GAS CONTAINERS X 2
[  ]  COTTON GLOVES X 2 PACKS
[  ]  ELECTRICAL TAPE X 10 ROLLS
[  ]  TEFLON TAPE X 3 ROLLS
[  ]  DUCT TAPE X 1 ROLL
[  ]  10W-30 OIL X 3 QTS.
[  ]  FUNNELS X 2
[  ]  RAGS
[  ]  HAND CLEANER
[  ]  DRINKING WATER COOLER
[  ]  CUP DISPENSOR w/ EXTRA CUPS
[  ]  5 GAL. DRINKING WATER X 2
[  ]  10'X10' CANOPY (COMPLETE)
[  ]  10' ALUMINUM LADDER
[  ]  FAT POLY. ROPES
[  ]  TOOLS LINES
[  ]  TUNA CHORD - 1 ROLL
[  ]  5 GAL. BUCKETS X 3 (EMPTY)
[  ]  SUN SCREEN X 2
[  ]

DEFENDANT'S EXHIBIT

**CABRAS MARINE CORPORATION**
COMMERCIAL PORT, APRA HARBOR, GUAM, M.I.
Suite 114 • 1026 Cabras Highway, Piti, Guam 96915
Tel. 477-7345 • Fax: 477-4206

# INVOICE

54026

| | SALESPERSON | DATE OF INVOICE |
|---|---|---|
| | | 05/31/05 |

TO:

PRO MARINE TECHNOLOGY
P.O. BOX 11021
TAMUNING, GUAM 96931

NOTICE: A service charge at the annual percentage rate of 18% (monthly 1.5%) will be applied on all past due accounts. As an express condition of our providing credit and rendering services, please take notice that if this account is placed in the hands of an attorney to collect the amounts stated herein, we shall be entitled to recover our attorney's fees in addition to any other available remedy. We expressly reserve any and all rights which we may have to enforce maritime liens against any vessel/cargo to which we have rendered necessaries.

| ACCOUNT NO. | DATE SHIPPED | SHIPPED VIA | COL. PP. | F.O.B. POINT | TERMS | YOUR ORDER NUMBER |
|---|---|---|---|---|---|---|
| 308 | | | | | Net 15 Days | L:DIVING OPS |

| QUANTITY | | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | LAUNCH SVCS RENDERED (DIVING OPERATIONS) 5/21-25/2005 | | 6,750 - |
| | | Ok'd as per Joe Cruz  8/16/05 | | |
| 4.5 ~~5.00~~ | 242 | C/B CAJUN SERVICES 5/21-25/05 | 1,500.00 | ~~7,500.00~~ |
| 1.00 | 900 | LESS DISCOUNT ( INOPERATIVE SANITARY) | 100.00- | 100.00 |
| 2.00 | 703 | CRANE  0930H-1130H  5/20 | 85.00 | 170.00 |
| 2.00 | 703 | CRANE 0950H-1045H  (MIN 2 HRS)  5/26 | 85.00 | 170.00 |
| 1.00 | 800 | FUEL: 114.37 GALLONS @ $1.9579 = $223.93 | 223.93 | 223.93 |
| | | | SUBTOTAL | 7,213.93 ~~7,965.93~~ |
| | | % GRT EQUIVALENT | | 288.56 ~~322.56~~ |
| | | | TOTAL ➤ | ~~8,206.4~~ 7,502.4 |

CERTIFIED TRUE AND CORRECT

*Thank You!*

ORIGINAL CUSTOMER

5926

Pro Marine Technology

CABRAS MARINE CORPORATION                                      8/18/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|---|---|---|---|---|---|---|
| 8/16/2005 | Bill | | 7,502.49 | 7,502.49 | | 7,502.49 |
| | | | | | Check Amount | 7,502.49 |

BOG - Checking                                                     7,502.49

DEFENDANT'S EXHIBIT